[1] Reported in 264 N.W. 427.
Plaintiffs appeal from an order denying their motion for new trial after the cause had been heard and decision rendered for defendants. The facts are not in substantial conflict. But solution of the legal problems presented thereby is decidedly controversial, at least so counsel for the parties seem to think.
Ira Collins Soper, a native and resident of Kentucky, was the central figure in the drama now to be depicted. In October, 1911, lie and plaintiff Adeline Johnson Westphal were united in marriage. She was a widow with three young daughters, the issue of her first marriage. She and her three daughters lived with him until August, 1921, when he suddenly disappeared, not to be heard of again by his wife during his remaining lifetime. Their family life is said to have been a happy one. But there were many occasions when Mrs. Soper undoubtedly had real difficulties with which to contend. Soper was inclined to go on periodic sprees. He had been on such a spree immediately prior to his last departure from plaintiff wife. His sister, who was visiting at that time with the Soper family, had upbraided him about this affair and so had the wife of one of his friends. The Sopers are said to be proud of their family name, and the good repute of its members was a matter not to be lightly treated. On at least two prior occasions he had made unannounced trips, once to Memphis and at another time to St. Louis, after having been on such drunken sprees. But at the *Page 62 
time of the last mentioned occasion he studiously and almost fiendishly made his disappearance take on the aspect of suicide. He wrote several suicide notes to his wife, one of them ending with this significant statement: "If there is any hereafter may meet you again." His car was found at the bank of a near-by canal, and so were his hat and portions of his clothing. Pinned to his business card and left in his car was a note reading: "This belongs to Mrs. Soper."
The record abundantly supports the view that he did not intend to end his life but went through these performances for the sole purpose of deceiving his wife and to leave with her the impression that he had in fact committed suicide. He managed to leave Louisville, that being his home, without clue or trace. He first went to Canada and shortly thereafter came to Minneapolis. There he assumed the name of John W. Young. By that name, and that name only, he was known to his business and social acquaintances from the time he came to Minneapolis until his death in 1932, something like 11 years. In Minneapolis he became well acquainted and established both in a business and social way. He entered the fuel business and with one Karstens formed a corporation known as the Young Fuel Company. In 1922 lie married a widow, Mary Christopher, a resident of Minneapolis, and they lived together as husband and wife and were so known until she died in 1925. In May, 1927, he married defendant Gertrude Whitby, another Minneapolis widow, with whom he had been acquainted and had kept company for some six or eight months prior to their marriage. They lived together as husband and wife from the time of this marriage until his death in 1932, when he actually did commit suicide. Gertrude in good faith believed him to be a widower, he having informed her and many others that his first wife died of pneumonia many years prior thereto.
Some time after Young's marriage to Gertrude, he and Karstens were interviewed by one Smith, an insurance agent, who devised a stock insurance plan whereby provision was to be made for the surviving partner of the fuel company to acquire the entire business in event of death of one of them, the surviving wife of such deceased *Page 63 
partner to be compensated by life insurance to be taken out by each partner upon his life, premiums to be paid by the fuel company and charged as an item of operating expense. The purpose was to keep the corporate enterprise from becoming split up as to stock ownership in event of death of either owner. The capital of the fuel company was $10,000, represented by 400 shares of the par value of $25 each. The ownership of the stock was as follows: Karstens had 175 shares, Mrs. Karstens 25, Young 195, and Gertrude 5. Each owner, i. e., Karstens and Young, was to take out a policy of life insurance in the amount of $5,000 payable to First Minneapolis Trust Company as trustee. The resulting agreement, designated "escrow receipt," after reciting the deposit of 200 shares by each depositor, provides:
"Upon the decease of either John W. Young or Ferdinand J. Karstens, the Trust Company shall proceed to collect the proceeds of the Insurance Policies upon the life of such deceased Depositor, and shall handle and dispose of such proceeds as follows:
"The Trust Company shall deliver the stock certificates of the deceased Depositor to the surviving Depositor and it shall deliver the proceeds of the insurance on the life of the deceased Depositor to the wife of the deceased Depositor if living, and if not living, then to the representative of his estate, and the stock certificates that were deposited by the Depositor who is then the surviving Depositor, together with the policies of insurance upon his life shall be delivered to such surviving Depositor.
"All of the stock deposited hereunder and all of the policies deposited hereunder or any part thereof may be withdrawn by said two Depositors on the joint receipt of both of them."
The policies were duly issued and, with the stock certificates, appropriately indorsed, deposited with the trustee. The insurance premiums were paid by the fuel company. Shortly after Young's death the trustee collected the insurance money upon the policy issued upon his life and paid the proceeds over to defendant Gertrude as his surviving wife, and at the same time delivered to Mr. Karstens as the surviving partner decedent's 200 shares in the fuel company, together with the policy issued upon his life. *Page 64 
The trust officer who dealt with the parties was informed that the relationship between Young and Gertrude was that of husband and wife, likewise that of Karstens and his wife. No one except Young knew anything about the first wife. She was to all intents and purposes, as to all arrangements and engagement heretofore related, entirely out of the picture.
Several months elapsed after these matters had been properly closed by the parties, as they in good faith thought, when Mrs. Soper, the true wife of Young, put in her appearance. An administrator of the estate of the late Soper, alias Young, was appointed. He and Mrs. Soper brought this suit against defendants to recover the insurance money. The suit was brought upon the theory that this fund had been erroneously paid by the trustee to Gertrude.
Plaintiffs have assigned 40 errors and devote pages 18 to 50, inclusive, in their printed brief thereto. These are summarized, however, into more compact form thus:
"The essential issue, as it really presented itself at the trial, was this: granting that Mrs. Whitby was not the deceased's wife, could not be his wife, was not his heir, did not have and could not have any rights of inheritance, statutory or otherwise, did Soper, by some valid, clear, effective supervening instrument, valid as a will or as a present deed or conveyance inter vivos, shut off and determine, in her or in some one else's favor, the clear rights which his wife and heir would otherwise plainly have had? And, further, if it first be found that he actually did execute a valid instrument which clearly and unmistakably has that effect, to deprive his wife of her rights, did he have the power to do that, without his wife's consent, under our law?"
It must be conceded that defendant Gertrude never was the legal wife of decedent. Although her innocence of wrongdoing is clearly established and her good faith in entering into her marriage relation with Young is amply sustained, the fact remains that she can take nothing under the laws of descent. Nor do we think the escrow agreement can be considered a testamentary disposition of *Page 65 
the insurance money or of any other property included in that instrument. It was not so intended, and nothing therein contained can be so construed. Rather, so it seems to us, it takes the form of and functions as an insurance trust. The legal right to demand and receive the insurance money was by the agreement vested in the trust company. It was the payee in both policies. The legal title to the stock certificates vested in it. Immediately upon the death of the insured the rights of the settlors and beneficiaries were finally established. The duty of the trustee to act as in the agreement stipulated became operative. What had theretofore been a passive or inactive matter became at once upon Young's death an obligation requiring action. The trustee performed thereunder. It could do no more, and duty required it to do no less.
By 2 Mason Minn. St. 1927, § 8081, all trusts are abolished except as defined by and limited in the act. Section 8090 expressly authorizes trusts for such purposes as were here intended. Subsection 6 thereof furnishes the authority. Therein and thereby it is provided that a trust may be created, "For the beneficial interests of any person or persons, whether such trust embraces real or personal property or both, when the trust is fully expressed and clearly defined on the face of the instrument creating it; * * *." Under the terms of the escrow agreement it seems clear that the parties intended just such trust.
An insurance trust having been created, the cases seem to hold with practical unanimity that such trusts are nontestamentary. The mere fact that the settlor reserves the right to revoke the trust does not destroy its efficacy as an insurance trust if the event upon which the trust depends takes place before revocation is made effective. A late and very important case bearing upon this subject is Gurnett v. Mutual L. Ins. Co. 356 Ill. 612, 191 N.E. 250. The facts in that case were that the trustee had been made the beneficiary in certain policies of life insurance. The settlor was to pay the premiums, and he retained the right to change the beneficiary, borrow money on the policies, use the policies As security for loans, receive dividends, and he could surrender any policy for its cash surrender value. The agreement imposed no duty on the trustee *Page 66 
except to hold the policies and deliver them to the settlor upon his request. The trustee agreed that upon the insured's death it would collect the policies and pay the proceeds in accordance with the agreement entered into. Upon the death of the insured his creditors attacked the transaction, claiming that it was testamentary in character and that the insured had relinquished no interest in the insurance policies to the trustee. The court, however, came to the conclusion that a trust was created inter vivos and that as such the beneficiaries under the trust agreement were entitled to the proceeds of the policies. The court amongst other things said,356 Ill. 619:
"Their [insurance companies] obligations to pay and the right of the trustee to receive the proceeds of the policies, upon the happening of the contingency specified, were determined when the companies noted upon the face of the policies the exercise, by the insured, of his right or privilege to change the beneficiaries. The date of the death of the insured merely fixed the time when the obligation of the insurers to pay and the right of the beneficiary to receive the proceeds of the policies became enforcible." This case is carefully analyzed, as are many other cases bearing upon this matter, in an interesting and instructive article appearing in 18 Minn. L.Rev. 391, under the title, "The Insurance Trust as a Non-Testamentary Disposition." In that article the author, at p. 398, has this to say:
"In other words, it is submitted that if a life insurance policy payable to a third party beneficiary is not testamentary, a life insurance trust is not, for in both cases legal title to the insurance funds is given by the policy to the designated beneficiary. In the case of a trust a split property interest is involved, but this is a trust problem, not a problem in wills." And on the following page: "It may be concluded that life insurance trusts * * * will not be held to be testamentary even though the trustee is named as third party beneficiary."
Other cases bearing upon this subject are Bose v. Meury, 112 N.J. Eq. 62,163 A. 276; Beirne v. Continental-Equitable T. T. Co. *Page 67 307 Pa. 570, 161 A. 721; In re Voorhees' Estate, 200 App. Div. 259,193 N.Y. S. 168; In re Haldrich's Estate, 134 Misc. 741,236 N Y S. 395; Fidelity Trust Co. v. Union Nat. Bank, 313 Pa. 467,169 A. 209.
Even if it be conceded that this was not an insurance trust, the authorities generally seem to hold that such arrangements, even if not involving the trust aspect, are valid as intervivos transactions because they are contractual in nature. Thus in Coe v. Winchester, 43 Ariz. —, 33 P.2d 286, it appears that two partners entered into a written agreement whereby each agreed that he would effect a policy of life insurance payable to his wife. On the death of either the wife of the deceased was to get the insurance and the surviving partner was to take the deceased's interest in the partnership. Under Arizona law each partner's interest in the business is community property belonging equally to the partner and his wife. But as to such property the husband has complete right of disposal of the entire interest by any deal inter vivos but cannot make a testamentary disposition of his wife's interest. One of the partners died. His wife claimed a one-fourth interest in the business upon the theory that the attempted disposition of the property was testamentary and therefore could not affect her community interest. The court came to the conclusion that the contract was not a testamentary disposition of property and that as such the entire one-half interest of the deceased partner had been validly transferred. Other cases upon this phase are Murphy v. Murphy, 217 Mass. 233, 104 N.E. 466; In re Mildrum's Estate, 108 Misc. 114, 177 N.Y. S. 563; In re Eisenlohr's Estate, 258 Pa. 438, 102 A. 117; McKinnon v. McKinnon (C.C.A.), 56 F. 409; Thompson v. J. D. Thompson Carnation Co. 279 Ill. 54, 116 N.E. 648, Ann. Cas. 1917E, 591. In the last cited case the court held an agreement between a stockholder and a corporation, of similar nature, import, and purpose to those partnership cases hereinbefore cited, to be mutually binding upon each and all the parties thereto from the date of its execution. It was held there that there was no testamentary disposition of the property.
We conclude that Gertrude neither did nor could take anything as the "wife" of Young. As a matter of law she never became such. *Page 68 
But this conclusion does not solve our problem because she does not lay claim to the insurance merely as his lawful wife, but as the person intended to be the beneficiary under the escrow agreement as fully as if her name had been written into that contract instead of the word "wife." So the real question presented is whether under the escrow agreement designating the "wife" of depositor Young as the beneficiary parol proof is admissible that Gertrude was so intended and not Mrs. Soper, the true wife. Plaintiffs claim that the written instrument is free from ambiguity, latent or otherwise, and that as such it was improper for the trial court to permit oral evidence to show who was intended thereby to be such beneficiary. They strenuously assert that the agreement is not subject to construction, that it is perfectly plain in its language, and that the only thing for the court to determine is whether Mrs. Soper was the lawful wife of the deceased husband or if Gertrude was such.
From the facts and circumstances hereinbefore related the conclusion seems inescapable that Gertrude was intended. She was the only one known or considered by the contracting parties. True, Young knew otherwise, but that he did not intend his real wife to take anything as beneficiary seems obvious. From the time lie left Louisville and came to Minneapolis, and until some time after his death, no one amongst his business or social acquaintances knew anything of or concerning his true wife. Gertrude alone answered the descriptive designation of "wife." Public records disclosed her and her alone to be such. There was no one else.
The question of who is one's wife is at times, under circumstances similar to what we are here considering, a matter of grave concern and genuine dispute. There may be involved the question of divorce, whether the court had jurisdiction of the status or of the parties, and many other difficulties. In many cases fact questions arise ordinarily capable of proof only by means of the aid of oral testimony. The question of identification of the individual intended by the written instrument very often involves and requires oral proof. That is the situation here. The right to the money here involved is claimed by both Adeline Soper and Gertrude Young. In *Page 69 
what manner may either establish relationship to the decedent as his "wife" except by means of oral testimony? Ira Collins Soper and John W. Young, in the absence of proofcontra, would likely lead an inquirer to the view that two different men were involved. Adeline, to establish her relationship, was necessarily required to and did furnish proof, principally oral, that her husband, Ira Collins Soper, was in fact the same individual as John W. Young. Gertrude by similar means sought to establish her claim. Of course the proof was such as to require a finding sustaining Adeline's claim. No one questions that result. But until such proof was adduced it is equally clear, both from public records in Hennepin county and general repute, that Gertrude had been duly married to John W. Young. All friends and acquaintances knew and recognized her as his wife. There was nothing in Minneapolis or in this state indicating otherwise. Were we to award the insurance fund to plaintiff Adeline, it is obvious that we would thereby be doing violence to the contract entered into by the decedent Young with his associate Mr. Karstens. That agreement points to no one else than Gertrude as Young's "wife." To hold otherwise is to give the word "wife" "a fixed symbol," as "something inherent and objective, not subjective and personal." Dean Wigmore in his excellent work on evidence, 5 Wigmore, Evidence (2 ed.) § 2462, p. 378, has this to say:
"The ordinary standard, or 'plain meaning,' is simply the meaning of the people who did not write the document. The fallacy consists in assuming that there is or ever can be someone real or absolute meaning. In truth, there can be only someperson's meaning; and that person, whose meaning the law is seeking, is the writer of the document." And further, p. 379: "The truth is that whatever virtue and strength lies in the argument for the antique rule leads not to a fixed rule of law, but only to a general maxim of prudent discretion. In the felicitous alliteration of that great judge, Lord Justice Bowen, it is 'not so much a canon of construction as a counsel of caution.' "
It is argued that in two other life insurance policies, issued by the same company upon the life of John W. Young, the beneficiary *Page 70 
was named "Gertrude Young, wife" of insured. These policies were issued respectively on October 6 and 26, 1925. Both policies were payable to "the executors, administrators or assigns of the insured, or to the duly designated beneficiary." On October 6, 1927, both policies were changed as to beneficiary so as to read as above stated, "Gertrude Young, wife." This does not tend to prove a different intention on the part of the insured than what he sought to accomplish when the escrow agreement was made. Rather, it points strongly to the conclusion reached by the trial court that Gertrude Young was the "wife" whom he sought to protect. As to these policies no issue is raised. They were not included in the escrow agreement. We are limited strictly to the policy deposited with the trust company wherein it was designated the beneficiary.
In the books are found numerous cases wherein similar situations have arisen. Several cases have come before this court wherein the particular question now being considered has arisen. Thus in In re Swenson's Estate, 55 Minn. 300,56 N.W. 1115, testator had made a will in 1884. He and his wife had no children, and they were then of such age that it could not be expected that they would have any. Under the statutes of descent then in force, his heirs would have been his next of kin, of whom there were then living a brother and two sisters. While testator was still living the statute was changed so that the sole heir would be his wife. However, the will gave certain property to his wife with the residue to "my heirs at law, share and share alike." There it was held that the next of kin took the residuary estate. The court said, 55 Minn. 310,56 N.W. 1116, 1117:
"Nor is there an inflexible rule for determining the meaning of the words 'heirs at law,' or any other words found in a will. From an examination of the authorities it will be found that these particular words have been construed to mean children, adopted children, next of kin, heirs of a particular class or description, heirs presumptive, heirs apparent, heirs at the date of the will, heirs at the decease of the testator, or heirs at a later date even, the construction seeming to rest and to be predicated upon an ascertainment *Page 71 
of the testator's intention from the words used, from the context of the instrument and from the surroundingcircumstances." (Italics ours.)
In Anderson v. Brower, 148 Minn. 44, 180 N.W. 1019, the facts were that testator had by will made specific provision for his wife. He had also made provision for his son wherein, upon certain conditions arising, the son should not take and the property was to go to testator's "legal heirs." The son did not take because of the proviso, and the issue arose as to who were the legal heirs within the meaning of the will. The court said, 148 Minn. 48, 180 N.W. 1020:
"It is sometimes said that the intent of the testator is to be derived by a 'four-cornered' view of the will. Words used may or may not be given their technical meaning. They are to be given such meaning as gives effect to the real intent of the testator. Such words as heirs, or legal heirs, though their technical significance is not to be overlooked, may, to give effect to the testator's intent, be held to refer to others than those who are technically heirs and may exclude those who are technically heirs." (Citing many cases.)
In Wilmot v. Minneapolis A. T. Assn. 169 Minn. 140, 142,210 N.W. 861, this court said:
"The duty of courts is to apply contracts to their subject matter and so effect the purpose of the parties. Their interpretation is incidental. To accomplish the main object resort may and frequently must be had to the circumstances under which the contract was made and, if there be need for resort to extraneous aids to construction, it is immaterial whether such need arises from an uncertainty in the instrument itself or, that being clear standing alone, it ceases to be so and ambiguity arises when the contract is applied to its subject matter. In either case construction must follow and resort must be had to the aids furnished by extrinsic circumstances. The prohibition of the law is not against their being used for interpretation but against making them the instruments of contradiction of an expressed contractual intent. The old *Page 72 
distinction between patent and latent ambiguities, never more than 'an unprofitable subtlety' (Thayer, Preliminary Treatise on Evidence, 424), 'so far as contracts are concerned * * * may be wholly disregarded.' 2 Williston, Contracts, § 627." To hold as plaintiffs would have us do (169 Minn. 143), "would thwart the one purpose of construction which is to ascertain the intention of the parties themselves. It would sacrifice rationalism to that 'primitive formalism which views the document as a self-contained and self-operative formula' rather than an instrument the whole of which is in relation to extrinsic matter, and concerning which very frequently there can be no adequate understanding of purpose without first an understanding of the extrinsic facts and things upon which the writing must have its only operation."
After all, as we said in City of Marshall v. Gregoire,193 Minn. 188, 198-199, 259 N.W. 377, 381-382, 98 A.L.R. 711:
"A written contract is little more than a scrap of writing save as it operates with legal effect on matters extraneous to itself. Construction deals with the dynamic rather than the static phase of the instrument. The question is not just what words mean literally but how they are intended to operate practically on the subject matter. Thus, seemingly plain language becomes susceptible of construction, and frequently requires it, if ambiguity appears when attempt is made to operate the contract."
That is the situation here. The trust agreement has become "susceptible of construction" because "ambiguity appears when attempt is made to operate the contract."
The order is affirmed.