## HERMAN KARGER v. ROBERT E. WANGERIN AND ANOTHER.[1]

January 20, 1950.

No. 34,991.

*Bradford & Kennedy* and *Charles A. Lund,* for appellants.

*Monson & Donoho,* for respondent.

[1]Reported in 40 N. W. (2d) 846.

PETERSON, JUSTICE.

This is an action for reformation of a contract for the sale of land and specific performance of the contract as reformed. The appeal is from an order denying defendants a new trial after findings and order for judgment for plaintiff. Because Robert E. Wangerin was the owner of the land and his wife, Sophia, was joined as a defendant only because she was such, we shall for convenience refer to Robert as the defendant.

Two questions are presented for decision:

(1) Whether a contract for the sale of land under which the vendor reserved the right to cut and remove certain trees large enough to be made into timbers may be reformed so as to reserve 12 trees in a certain area, where there was neither allegation nor proof of mutual mistake or mistake on the one side and fraud or inequitable conduct on the other, and the evidence affirmatively showed that after the contract had been prepared for signing, but before that was done, both parties were satisfied that it embodied their intended contract; and

(2) Whether a statute regulating "logging operations" prohibiting the cutting of birch, maple, and oak trees of less than ten inches in diameter inside the bark, except where the operations are to clear land by bona fide farmers for actual agricultural use, applies to the cutting of trees of such kind but smaller size by a vendor under reservation in a contract for deed of the right to do so by a vendor not engaged in logging operations.

On May 6, 1946, defendant, as vendor, and plaintiff, as vendee, entered into a contract, a copy of which was annexed to the complaint, under which defendant agreed to sell to plaintiff an 80-acre tract of land, reserving the right "to cut and remove certain white oak trees that are large enough to run through a saw mill and make oak timbers." The purchase price, $1,500, has been paid. There were on the land 192 white oak trees of the size mentioned. There were 12 such trees with a diameter of from 8 to 12 inches situated within a radius of 300 feet of a barn.

The complaint sets forth what purports to be three causes of action, of which only two are relevant here, for the reason that the third depends upon the establishment of at least one thereof. The first cause of action alleges that "immediately before the said contract was entered into" the parties specifically agreed that the reservation covered only white oak trees from 8 to 12 inches in diameter situated within 300 feet of the barn and that there were 12 such trees. The second cause of action alleged that the "real intention" of the parties was to reserve to the vendor only the 12 white oak trees mentioned; that the reason the trees covered by the reservation were not *definitely* described was that the matter was "a trivial and small" one; and that the contract should be reformed to express such intention. There was no allegation in either cause of action that through mutual mistake, or mistake on the one side and fraud or inequitable conduct on the other, the so-called *real intention* of the parties was not expressed in the written contract. The answer, which controverted all the material allegations of the complaint, expressly alleged that the written contract expressed the complete and real intention of the parties, and set forth a counterclaim for the value of some trees which defendant claimed under the reservation and which plaintiff had cut.

The evidence showed that there were 192 white oak trees on the land large enough to be made into timbers by running them through a sawmill and that there were 12 white oak trees from 8 to 12 inches in diameter within a radius of 300 feet of the barn; that there were trees of many kinds and sizes growing on the land; that for about 24 years prior to the date of the contract defendant owned the land and lived thereon; that he operated thereon a woodworking and blacksmith shop, fully equipped with necessary machinery, for the purpose of making wagon poles, sleds, and farm machinery; that he obtained from the land white oak trees for timbers needed in operating his shop, which were of a quality especially desirable for such purpose; and that, when he moved from the land upon the sale thereof to plaintiff, he intended to operate a similar shop in the village of Parkers Prairie. While it was not expressly so stated, it

appeared from the arguments that defendant's business consisted of so-called custom trade rather than one of manufacturing for the general market.

A banker in Parkers Prairie acted as scrivener. His uncontradicted testimony was to the effect that both parties stated the facts as to their intended contract; that there were to be reserved to defendant, as vendor, from the sale some buildings and some oak trees; that he requested a particular description of the trees and inquired whether they had been counted; that the trees had not been counted, but that the parties had agreed among themselves "what trees there were"; that defendant said "that they were trees big enough to make timbers after they were sawed into logs and taken to the saw mill, and it would be made into timbers that he wanted to use in his workshop in Parkers Prairie for material for sleigh timbers, making sleds or repairing sleds"; that thereupon he (the scrivener) proposed, and the parties agreed to, the description, which was inserted in the contract, viz., "certain white oak trees that are large enough to run through a saw mill and make oak timbers."

There was much other testimony. Plaintiff testified that he did not discuss in the scrivener's office the number of trees to be reserved (the scrivener testified that the number was not mentioned); and that it was there stated that only "Big stuff to run through a saw mill to make timbers out of" was to be reserved. After plaintiff took possession, a controversy arose as to which trees were reserved. Plaintiff's attorneys wrote to defendant advising him that he was entitled to only a "few" trees. They did not claim therein that the reservation covered only *12* white oaks or *12* trees of any particular kind. After the controversy had arisen, plaintiff, evidently acting on a suggestion of the scrivener when he drew the contract that the trees should have been marked, marked the 12 white oak trees 8 to 12 inches in diameter which were within a 300-foot radius of the barn and informed defendant that those were the trees to which he was entitled under the reservation clause.

The trial court, among other things, found that it was the manifest intention of the parties to reserve "twelve white oak trees located" near the barn in the southeasterly corner marked by plaintiff, and ordered judgment for specific performance of the contract, reserving to defendant the 12 trees mentioned. There was no finding of mutual mistake, or mistake on the one side and fraud or inequitable conduct on the other, and no order for reformation of the contract.

On appeal, defendant contends that the findings and conclusions are the result of violation of the rule against varying written contracts by parol evidence and that there is no basis in the pleadings, proofs, or findings, for lack of allegations, evidence, and findings of mistake, fraud, or inequitable conduct, to support either an order for judgment for reformation, or one such, as here, which would grant what only a judgment for reformation could, but without granting reformation itself. Plaintiff contends that the findings and order for judgment are in accordance with the *real intention* of the parties; that, aside therefrom, even though he marked some white oak trees less than 10 inches in diameter (*i. e.,* the 8-inch trees) as those to which defendant was entitled under the reservation, defendant was prohibited by M. S. A. 90.215, subds. 1, 4, and 6, from taking any trees less than 10 inches in diameter under the bark; and that the reservation was void to the extent that it otherwise provided.

■ The rule has become mere hornbook law that, where parties have reduced their contract to writing, the contract may not be proved by prior or contemporaneous utterances or writings and that these are entirely immaterial for the purpose of determining what the terms of the contract are. By making the writing the only depository and memorial of the contract, what was said during the negotiations therefor or at the time of its execution must be understood to be superseded by the writing, and so much of what was thus said as is not carried forward into the writing must be deemed to have been waived or abandoned. The rule is not one of evidence, but of substantive law—the writing is the contract, not merely the

evidence thereof. Antecedent and contemporaneous utterances are excluded, not because they are lacking in evidentiary value, but because the law for substantive reasons declares that such matters shall not be shown. If the rule were otherwise, there would be an absurd futility in written contracts which it is the purpose of the parol evidence rule to prevent. Henvit v. Keller, 218 Minn. 299, 15 N. W. (2d) 780; Haglin v. Ashley, 212 Minn. 445, 4 N. W. (2d) 109; Seifert v. Mutual Benefit L. Ins. Co. 203 Minn. 415, 281 N. W. 770; Steward v. Nutrena Feed Mills, Inc. 186 Minn. 606, 244 N. W. 813; Rast v. Bergquist, 182 Minn. 392, 235 N. W. 372; 2 Dunnell, Dig. & Supp. § 3369. Where equity reforms a written contract upon the grounds of mistake, fraud, or inequitable conduct, "still it is the writing as corrected that is the measure of the parties' undertaking, and they cannot be otherwise held." Seifert v. Mutual Benefit L. Ins. Co. 203 Minn. 423, 281 N. W. 774, *supra*.

As applied here, the first cause of action simply amounted to an assertion by plaintiff of a right to recover not upon the written contract between the parties, but upon one based upon prior and contemporaneous utterances at variance therewith. This, of course, cannot be done under the parol evidence rule. The second cause of action did not differ from the first in substance. The allegations, that the *real intention* of the parties was evidenced by their antecedent and contemporaneous utterances and that the intention so evidenced was what the parties meant by the contract, amounted only to another attempt to vary the written contract by parol evidence. This, likewise, was not permissible under the parol evidence rule. Unless, therefore, there was some basis for reformation, plaintiff was entitled to no relief under the pleadings and proofs.

■ Absent mutual mistake, or mistake on the part of one of the parties and fraud or inequitable conduct on the part of the other party, equity will not reform a written contract. This means that the parties must have agreed upon a valid contract sufficiently expressing their intention; that there was a written contract which it was intended should express such intention, but did not; and that the failure was due to either mutual mistake or mistake on

one side and fraud or inequitable conduct on the other. Unilateral mistake will not suffice. In addition, the complaint must set forth the facts constituting the mutual mistake or other conduct constituting the basis for reformation, and the proofs must clearly establish plaintiff's right to such relief. Johnson v. Benham, 163 Minn. 31, 203 N. W. 444; Fritz v. Fritz, 94 Minn. 264, 102 N. W. 705; Martini v. Christensen, 60 Minn. 491, 62 N. W. 1127; 5 Dunnell, Dig. & Supp. §§ 8328, 8329. Here, no equitable ground for reformation was alleged, and the proofs failed to establish any. According to the uncontradicted testimony of the scrivener, the written contract embodied the contract which the parties had agreed upon. They assented to the writing as being such.

■ The word "certain" in the reservation clause means all trees of the kind there mentioned. Of course, the word "certain" is one of variable meaning. See, 6 Wd. & Phr. (Perm. ed.) pp. 417 to 419. In the particular case, the meaning is to be ascertained by settled rules of construction. Here, we think that the context shows that the word meant *those* or *all* such trees. In Bell *adsm.* Martin, 18 N. J. L. 167, it was held that a writing acknowledging receipt of a note as collateral security for "certain" notes held by the receiptor against the giver meant *all* the notes held by the receiptor and not a part thereof. There the court said (18 N. J. L. 168):

"* * * The language of the agreement, is plain and unequivocal, and clearly expresses the meaning of the parties; that the note of Barton and others should be held as collateral security for *certain* notes of Geo. W. Tyson & Co. then in the hands of Robins and Martin. This is the plain reading of the instrument: the word 'certain,' creates no uncertainty; but on the contrary shows what notes of Geo. W. Tyson & Co. were intended, namely: those then in the hands of Robins and Martin."

Here, the description in the reservation clause of the trees as being white oaks large enough to be run through a sawmill and made into timbers was plainly for the purpose of identifying such trees so as to segregate them from other trees, both oaks and other species, then on the land. The word "certain" as used in the

reservation clause was used as synonymous with "those"—those trees of the description mentioned. That, of course, means *all* the trees of such description.

■ The cutting and taking of white oak trees by defendant was not, under the circumstances of the case, illegal under M. S. A. 90.215. Subd. 1 thereof declares that the purpose of the act is to establish and enforce uniform and wise cutting practices in "logging operations." Subd. 4 prohibits the cutting of birch, maple, or oak trees which do not have a stump diameter inside the bark of 10 inches or more. Subd. 5 empowers the director of the division of forestry to adopt certain rules and regulations in connection with the disposal of "slash." Subd. 6 provides that the act shall not apply to clearing of land by bona fide farmers for actual agricultural use and to certain other cases. "Logging operations" ordinarily means the felling of trees of merchantable size for lumber, cutting them into logs, and transporting the logs to sawmills or market. Pierson v. General Plywood Corp. 76 Ga. App. 853, 47 S. E. (2d) 605; Hogan v. T. J. Moss Tie Co. 210 La. 362, 27 So. (2d) 131; Peterson v. State Ind. Acc. Comm. 140 Or. 326, 12 P. (2d) 564; 25 Wd. & Phr. (Perm. ed.) p. 587. The words "logging operations" were used in the statute with such meaning. In the Peterson case, *supra,* cutting cordwood was held to be a logging operation. The expression carries a connotation of clearing the land by tree-cutting operations and the ultimate disposal to the buying public of the trees in the form of lumber. The operations here contemplated were not of such a character. It is clear that it was the intention of the parties that defendant should not engage in any cutting operations on the scale mentioned, and that any trees cut by him were intended not for sale in the shape of either lumber or cordwood, but solely for custom manufacture in his woodworking shop, where he made wagon poles, sleds, and farm machinery.

Plaintiff's contention that the cutting of trees of less than 10 inches in diameter is illegal is inconsistent with his claim that defendant was entitled to cut and remove some trees *eight* inches in diameter, which he marked for the purpose. These were included

among those the trial court ordered that defendant had the right to remove.

In conclusion there must be a reversal and judgment ordered for specific performance, reserving to defendant the right to cut and remove not 12 white oak trees 8 to 12 inches in diameter located within a radius of 300 feet from the barn, but the 192 white oak trees on the land sold large enough to run through a sawmill and made into timbers. Defendant's counterclaim remains for disposition below.

Reversed and remanded with directions to proceed in accordance with the opinion.