The **TELEX CORPORATION**, Appellant,

v.

**D. E. BALCH**, Appellee.

**No. 18607.**

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1967.

------◆------

Lawrence Johnson, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., made argument and filed brief for appellant.

Gary E. Persian, of Smith, Johnson & Persian, Minneapolis, Minn., made argument and filed brief for appellee.

Before VAN OOSTERHOUT, BLACKMUN and LAY, Circuit Judges.

LAY, Circuit Judge.

This is an appeal from a judgment rendered in two counts for appellee arising out of an alleged contractual relationship of the parties.

In the first count, appellee sued and recovered $4,125.00, based upon a written agreement of the parties, and on the second count, $10,000.00, described as a "recruiting fee" by the parties. Trial was to the court alone.

Telex, Inc., a Minnesota corporation, was the original party to all negotiations and contracts involved. The events in question occurred during 1961 through December 1962. In February of 1963 Telex Corporation was formed and became the successor corporation, assuming all liabilities of Telex, Inc. Appellant raised separate defenses. In Count I, appellant contends the September 15, 1961, agreement sued upon constituted the entire written contract of the parties and any attempted variation of it violated the "parol evidence" rule. In Count II, appellant argues the "recruiting contract" was void, since it was executed in violation of the Minnesota Statutes, infra n. 8, requiring all employment agencies to be licensed with the state. Appellee concededly had no license.

The trial court rejected both defenses and found for the appellee on both counts. We affirm.

The September 15 agreement is set out in full below.[1] A. J. Ryden, Jr., was President of Telex, Inc. at the time of the agreement, but relinquished this post in June or July of 1962. Clyde W. Kaericher was Administrative and Financial Vice President until December 1962, and handled all the financial aspects of the corporation. He prepared the employment agreement of September 15, which was a variation of one of several employment agreements used by Telex. Kaericher testified by deposition and Ryden appeared at the trial. Stephen A. Keller was President of Telex from 1962 until

---

1. "THIS AGREEMENT made this 15th day of Sept., 1961, by and between TELEX, INC., a Minnesota corporation, and hereinafter called 'Telex' and D. E. BALCH, hereinafter called 'Balch.'

*WITNESSETH*

"1. *Employment and Duties*—Telex hereby employs Balch as Assistant to the President for Organization Management.

"2. *Performance*—Balch shall devote a minimum of Twenty-four (24) days per year to the business of the corporation, which duties shall be performed at the times requested by the corporation, and Balch agrees to hold himself available for consultation during the course of the year. Balch's duties shall consist of planning and assistance in the areas of organization management and personnel.

"3. *Terms*—Telex agrees to employ and Balch agrees to be employed by Telex from the date hereof. Either party may terminate this agreement on thirty days notice.

"4. *Compensation*—Telex shall pay to Balch a salary of Three Hundred Dollars (300.00) per month, the net amount after employee deductions and withholdings to be paid on the last day of the month.

"IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed the day and year first above written.

"TELEX, INC.
"By S/ A. J. Ryden,
 A. J. Ryden, Jr.,
 President
"By S/ D. E. Balch
 D. E. Balch"

1965, and was hired originally by Telex, Inc. as General Manager and Executive Vice President. The $10,000.00 fee in Count II is admittedly the reasonable value for appellee's services in "finding" Keller for Telex, Inc. in May 1961. Keller did not testify at the trial.

In Count I, the dispute centers around appellee's claim for compensation for services rendered to the corporation by Balch pursuant to the contract of September 1961. Appellee made claim for 27½ days' time at $150.00 a day. He commenced work under the contract in September until it was terminated in October 1962. He worked a total of 27½ days over the 24 days required by the contract in 1962 and the 7 days he worked in 1961 (October, November and December).[2] Appellant resists the claim on the theory that the 27½ days were included in the compensation of $300.00 per month, as set forth in the written contract.

Ryden testified he let Kaericher and Balch work out the details of Balch's employment by Telex, including compensation. Prior to September 15, Telex de-

sired to hire Balch as a management consultant. Balch normally charged $200.00 a day for this work but desired some type of stock option arrangement rather than straight per diem compensation. Balch, Kaericher and Ryden met in August 1961, and it was decided that Balch would have to become an employee of Telex to qualify for any stock option plan. It is undisputed that this is the reason for the September 15 agreement. The following events and testimony are relied upon by Balch as parol testimony to show the intent of the parties in carrying out the September 15 agreement to support his recovery under Count I: (1) In September a stock option agreement was signed. (2) In October 1961, Kaericher and Ryden met and Balch summarized in a memo dated October 18, 1961, their previous discussions which contemplated payment of Balch for services in excess of 24 days at the rate of $150.00 a day. According to Balch, both Kaericher and Ryden *approved* the contents of the memo and Ryden was given a copy of it.[3] (3) In December Exhibit 3 was presented and *ap-*

2. In February 1962, Balch personally discussed with Kaericher the following memo:

"According to the terms of our understanding last fall, each quarter, we were to review the amount of time that had been devoted to Telex and where we stand under our agreement.

"During the period Sept. 15 and December 31, 1961, I devoted 20½ days to Telex business. My obligation being at the rate of 2 days per month, there was an obligation to devote 7 days during this period. Any excess was to be carried forward and to be credited against my time obligations in the future —during the stock option period. This means that 13½ days were carried forward into 1962.

"Also attached is statement for expenses during this same 3½ month period, totalling $43.38."

3. The memo (Exhibit 2) reads in part:
"*Future Services:* We've now entered into an arrangement for Telex under the terms of which I am to spend 24 days per year at the rate of $300 per month and with options in Telex stock

to be granted. This is much appreciated. A first 'look see' was to be taken of Executive Compensation with the thought that this would likely lead to other things to be undertaken. This work is well underway, and as you suggested, is revealing a number of related problems * * * The question also has come up as to show to handle time put in for Telex beyond two days per month since more time than that will be required to do very much. It seemed most logical to me to do the work we agree needs to be done spending whatever time is required, and consider that time put in beyond two days in a current month is being applied to my time obligation for future months. Thus in the first few months, as you observed, my time commitment for the full twelve months might be fulfilled or carried even further ahead. Clyde and I were in agreement that every three months there should be a review of the time which has been spent on Telex work, on the work in prospect for the future and be certain we are all satisfied on the terms and the way things are being handled."

*proved* by Kaericher and Ryden [4] as the amount due and owing Balch. (4) Kaericher's testimony at the trial agreed that Balch was to work 24 days a year, and that any excess days would accrue to Balch's credit into the next year. This interpretation by the persons who negotiated the contract was not denied by Telex. However, all of this evidence was objected to as violating the parol evidence rule.

The trial court concluded that the September 15, 1961, agreement was ambiguous. The court alternatively found that on October 18, 1961, the parties modified the September 15, 1961, contract and pursuant thereto, appellee would be paid in excess of 24 days per year at the rate of $150.00 per day. The court likewise found that the parties had orally contracted to this effect prior to the September 15, 1961, written agreement; the court further found an agreement entered into by the parties on December 12, 1962, that Balch would be compensated for those 27½ days in excess of the 24.

■ The finding of modification *presupposes a change* from the original written agreement. This finding is inconsistent with the September agreement sued upon, and itself contradicts the finding that the September agreement when explained by extrinsic evidence supports appellee's recovery. Alternate, but inconsistent theories may be pleaded, but cannot exist together as inconsistent

findings to support the judgment. But the court's findings of modification cannot stand for several reasons. First, the facts essential to this theory were not even pleaded as an alternative basis of recovery. Secondly, the alleged modification of October 18, 1961, and December 12, 1962, are admittedly premised in part upon conversations carried on prior to the written agreement. Any agreements relating to the subject matter of the contract, occurring prior to the written contract, are conclusively presumed to be incorporated into the writing. See Farmers Mut. Hail Ins. Co. of Iowa v. Fox Turkey Farms, Inc., 301 F.2d 697 (8 Cir. 1962); NLRB v. Nash-Finch Co., 211 F.2d 622, 45 A.L.R.2d 683 (8 Cir. 1954); Dunlop Tire and Rubber Corp. v. Thompson, 273 F.2d 396 (8 Cir. 1959). Thirdly, serious questions of consideration might challenge the legal validity of a gratuitous promise to modify an otherwise binding agreement.

■ Appellee urges alternatively that the September agreement is incomplete. Contention is made that since this is not an integrated writing, the extrinsic evidence relied upon is admissible to prove the full agreement. However, the doctrine of integration is of little help under Minnesota law. This rule allows parol evidence [5] where it relates to a non-collateral agreement and not one germane

---

4. Exhibit 3 is as follows:
 "Executive Recruiting Fee—S. A. Keller for General Manager of Telex, at standard rate per request and agreement with Telex
 $50,000 Salary at 20% ...................... $10,000.00
 "Other Services during 1962 as requested—Services thru Nov. 1962
 27½ Days at $150 per Day ................. 4,125.00
 "Services for Dec. 1962
 2 Days at $150 per Day ...................... 300.00
 $14,425.00
 300. pd. 12/31
 Bal. ............................. $14,125.00"

5. The parol evidence rule in Minnesota is viewed as a substantive rule of law rather than one of evidence. Karger v. Wangerin, 230 Minn. 110, 40 N.W.2d 846, 849.

to the subject matter of the writing.[6] Jimmerson v. Troy Seed Co., 236 Minn. 395, 53 N.W.2d 273, 276; Taylor v. More, 195 Minn. 448, 263 N.W. 537. Clearly appellee's evidence concerns payment for consultant services, which was the exact subject matter involved in the September 15 contract.

Minnesota law recognizes that when a contract bears more than one reasonable interpretation the ambiguity should be resolved against the party who drew the contract. Wallace v. Joseph Dixon Crucible Co., 223 Minn. 162, 25 N.W.2d 465 [employment contract]; Koch v. Han-Shire Investments, Inc., 273 Minn. 155, 140 N.W.2d 55; Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc., 268 Minn. 176, 128 N.W.2d 334. We feel the instant contract "is reasonably susceptible to more than one construction" and is therefore ambiguous. See Telex Corp. v. Data Products Corp., 271 Minn. 288, 135 N.W.2d 681.

In applying this test courts should ever be conscious that extrinsic evidence can only be considered to aid construction of the meaning of what is written and not to create a new and different contract. See Koch v. Han-Shire Investments, Inc., 273 Minn. 155, 140 N.W.2d 55. As has been said, "[t]he prohibition of the law is not against [parol matters] being used for interpretation, but against making them the instruments of contradiction of an expressed contractual intent." Wilmot v. Minneapolis Auto. Trade Ass'n, 169 Minn. 140, 210 N.W. 861.

Appellant contends the instrument is clear and concise in meaning. Appellant in effect states that Balch's duty to devote "a minimum of 24 days per year" simply places a floor, not a ceiling on the number of days Balch must serve to receive his salary of $300.00 per month. Appellant urges that services in excess of 24 days are necessarily included in the $300.00 a month salary since his duties are to be performed at the times requested by the corporation. We would agree that this is one possible meaning. Under appellant's interpretation Balch, a successful lawyer, businessman and management consultant, who normally makes $150.00 to $200.00 a day, might be subject to the demands of a corporation for 365 days a year at a salary of only $300.00 a month.

However, the contract immediately adds "*and* Balch agrees to hold himself available for consultation during

---

6. Professor Wigmore best explains the rule's application:

"Whether a particular subject of negotiation is embodied by the writing *depends wholly upon the intent of the parties* thereto. * * * This intent must be sought * * * in the conduct and language of the parties and the *surrounding circumstances.* The document alone will not suffice. * * * The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered. Thus the apparent paradox is committed of receiving proof of certain negotiations in order to determine whether to exclude them. * * * But the paradox is apparent only. The explanation is that these alleged negotiations are received only provisionally. * * * There is a preliminary question for the judge to decide as to the intent of the parties, and upon this he hears evidence on both sides. * * * If he decides that the transaction was covered by the writing, he does not decide that the excluded negotiations did not take place, but merely that *if* they did take place they are nevertheless legally immaterial. If he decides that the transaction was not intended to be covered by the writing, he does not decide that the negotiations did take place, but merely that *if* they did, they are legally effective, and he then leaves to the jury the determination of fact whether they did take place. * * * In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the *particular element of the alleged extrinsic negotiation is dealt with at all* in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation." IX Wigmore, Evidence, 3rd ed., sec. 2430, pp. 97–99.

the year." Another interpretation becomes possible: that Balch must devote *no less than* 24 days a year to qualify as a part time employee at a salary of $300.00 per month; but that additional consultation will be available to the corporation "during the course of the year" separate and distinct from his job as an employee. Telex drew the instrument and had every opportunity to express the terms in a more definitive manner. The surrounding circumstances readily demonstrate that the purpose of the September contract was to qualify Balch only as a part time employee for a stock option plan. It was not negotiated to take advantage of his services at an inequitable rate. As said in Donnay v. Boulware, 275 Minn. 37, 144 N.W.2d 711, at 715:

> "We cannot assume that the parties intended to enter into a contract which was unjust or that either party assumed that he would secure an advantage not clearly expressed in its terms."

Immediately preceding this, the court said:

> "The court should try to place itself in the position of the parties when they were dealing for the purchase of the real estate, and from a consideration of the instrument as a whole in light of the surrounding circumstances endeavor to arrive at their real understanding."

However, the ambiguity of the instrument itself need not be debated. In Minnesota an ambiguity need not exist only on the face of the instrument. As the Minnesota Supreme Court said in City of Marshall v. Gregoire, 193 Minn. 188, 259 N.W. 377, 381–382.

> "A written contract is little more than a scrap of writing save as it operates with legal effect on matters extraneous to itself. Construction deals with the dynamic rather than the static phase of the instrument. The question is not just what words mean literally, but how they are intended to operate practically on the subject-matter. Thus, seemingly plain language becomes susceptible of construction, and frequently requires it, *if ambiguity appears when attempt is made to operate the contract*." [7] (Emphasis ours)

See also In re Soper's Estate, 196 Minn. 60, 264 N.W. 427.

In the performance of the contract the parties demonstrated that accumulated time from prior months was to be carried over to succeeding months. Thus Balch worked only ½ day in October and no time in November or December. He, however, was actually paid on the basis of accumulated time. Kaericher testified that he had worked out a plan to carry Balch's time over from one month to the next, and one year to another. They met from time to time to discuss this fact of performance. This evidence was not only admissible but of practical importance in showing how the parties carried out the contract in actual performance. See American Crystal Sugar Co. v. Nicholas, 124 F.2d 477 (10 Cir. 1941). The contract was silent as to

---

7. The Minnesota Supreme Court said in Wilmot v. Minneapolis Auto. Trade Ass'n, 169 Minn. 140, 210 N.W. 861–862:

> "To accomplish the main object, resort may and frequently must be had to the circumstances under which the contract was made, and, if there be need for resort to extraneous aids to construction, it is immaterial whether such need arises from an uncertainty in the instrument itself, or that being clear, standing alone, it ceases to be so, *and ambiguity arises when the contract is applied to its subject-matter*. In either case construction must follow, and resort must be had to the aids furnished by extrinsic circumstances.
>
> \* \* \* \* \*
>
> It would sacrifice rationalism to that 'primative formalism which views the document as a self-contained and self-operative formula,' rather than an instrument the whole of which is in relation to extrinsic matter, and concerning which very frequently there can be no adequate understanding of purpose, without first an understanding of the extrinsic facts and things upon which the writing must have its only operation." (Emphasis ours)

the method of payment of accrued time in the event Balch was terminated. Cf. Wallace v. Joseph Dixon Crucible Co., 223 Minn. 162, 25 N.W.2d 465. This testimony in no way rewrote the September agreement or added to it. It simply explained how the contract was to be carried out. We do not view the October or December memos as agreements, new or old. They serve solely as extrinsic acts of ratification of the procedure being carried out by the parties in the performance of the September agreement. See McCormick, Evidence, § 221, p. 448, n. 9.

As Judge Woodrough has said:

"When it is once established that the contract is ambiguous then the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact." United States v. Northern Pac. Ry. Co., 188 F.2d 277 at 280 (8 Cir. 1951). We conclude to be uncontroverted Judge Lord's finding that the parties intended Balch to receive additional compensation for days in excess of 24 under the September agreement. Recovery is affirmed under Count I.

Count II pertains to an oral agreement entered into by Telex and appellee in March of 1961. Balch agreed to locate a general manager for the company.

His "recruiting fee" was to be twenty percent of the salary involved or $125,00 a day in the event no one was hired.

When contacted by Telex, Balch had been working as a management consultant in his own business located in Minneapolis. He began his search by interviewing all of the directors and obtaining their individual ideas on who or what was needed for the job. From this he drew up a set of specifications for the man to be sought. The search was conducted all over the United States and 20 to 25 candidates were finally produced. Reports were then submitted to the President and Board of Directors of Telex, who selected Stephen A. Keller who was then located in Toledo, Ohio, as Vice President of Electric Autolight Company. Keller was designated as General Manager and Executive Vice President and subsequently served as President of Telex. He reported for work on October 15, 1961, at an annual salary of $50,000.00. There is no dispute that Balch thereby became entitled to a $10,000.00 fee in accordance with the terms of his agreement with Telex.

After control of Telex began to shift, payment of this fee was refused. The refusal is premised upon the theory that appellee was conducting an employment agency operating without a license as required under the Minnesota statutes.[8]

8. M.S.A., 1966, Section 184.01, Subdivision 2:
"The term 'employment agent' or 'employment agency,' means any person, firm, corporation or association in this state engaged for hire or compensation *in the business* of furnishing persons seeking employment or changing employment, with information or other service enabling or tending to enable such persons to procure employment, by or with employers, other than such employment agent; or furnishing any other person, firm, corporation, or association who may be seeking to employ or may be in the market for help of any kind, with information enabling or tending to enable such other person, firm, corporation, or association to procure such help."
M.S.A., 1966, Section 184.02:
"No person, firm, corporation, or association shall open or carry on *an employment agency* in the state, unless such person, firm, corporation, or association shall first procure a license from the commission. Any person, firm, corporation, or association who shall open or conduct any such agency without first procuring a license shall be guilty of a gross misdemeanor and punished by a fine of not less than $25 and not more than $100 or on failure to pay such fine by imprisonment for a period not to exceed 90 days or both at the discretion of the court."
M.S.A., 1966, Section 184.11:
"A class two license shall entitle the holder thereof to engage *in the business* of serving those seeking employment and those seeking employees in technical (engineering or otherwise), educational, clerical, executive, hospital, medical, dental, and like pursuits not provided for under a class one or a class three license." (Emphasis ours)

Under appellant's theory the contract with Balch is illegal and therefore void.

 The statute encompasses within its scope only those engaged "in the business" of an employment agency. The trial court made a finding of fact that Balch's livelihood was that of a management consultant who advised clients on management and personnel problems and only incidental thereto occasionally helped them to recruit executive personnel. Unless this finding was clearly erroneous, we are bound to apply these facts under the statute to see whether appellee's business comes under the prohibition of the Act. When a state enacts regulatory provisions governing a specified business, isolated or incidental transactions are generally not prohibited. See Roberts v. Ross, 344 F.2d 747 (3 Cir. 1965); Com'r v. Garland, 29 Leh. L.J. 150 (Pa.Quar.Session) [temporary help to customers not within Act]; 53 C.J.S. Licenses § 27, p. 556. If the individual transaction is prohibited, e. g., the sale of real estate, then the substance of the *transaction* determines the applicability of the statute. Cf. Dodge v. Richmond, 5 A.D.2d 593, 173 N.Y.S.2d 786. However, here it is the overall *business* that is intended to be regulated. Thus, the conduct of appellee as a whole must be examined to determine whether he comes within the prohibition of the statute. The statute proscribes opening or conducting "any such agency." The trial court found that appellee was not operating any business as defined in the Act requiring licensing. The evidence amply supports this finding.

As stated in Weatherston's A. M. Serv. v. Minn. M. L. I. Co., 257 Minn. 184, 190, 100 N.W.2d 819, at 824:

"Justice and sound public policy do not always require the literal and arbitrary enforcement of a licensing statute."

 Moreover, although a class two license under the Minnesota statutes is necessary for those who are "in the business of serving those * * * seeking employees * * *" it is manifest from reading the statutes as a whole,[9] that regulatory control of the employment agency is designed to protect individual applicants from fraudulent and incompetent practices. See McQueen v. Williams, 173 Minn. 47, 216 N.W. 323.[10] This is the justification for the exercise of the police power of the state in this area. See Brazee v. People of State of Michigan, 241 U.S. 340, 36 S.Ct. 561, 60 L.Ed. 1034 (1916); Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913 (1928) and the dissenting opinion of Justice Stone, 277 U.S. at 359, 361, 48 S.Ct. at 548, wherein he says such businesses "deal with a necessitous class, the members of which * * * are often under exceptional economic compulsion to accept such terms as the agencies offer." It is difficult to reason that appellant is of a class intended to be protected.

 The prohibition of the statute must necessarily coincide with its recognized purpose of serving the public policy in protecting the public from misrepresentation and deceit. Heyman v. Howell, Sp.Sess., 133 N.Y.S.2d 19; National Staffing Consultants v. Dist. of Columbia, D.C.App., 211 A.2d 762; In

---

9. See M.S.A., 1966, § 184.15, as to the "rules governing agencies."

10. The Minnesota Supreme Court has expressly stated, that an employment agency "is subject to regulation to protect those who deal with such agencies from being defrauded, imposed upon, oppressed or misled. Those who seek the aid of such agencies are frequently in financial straits, and many are ignorant, weak and easily duped. To protect them from fraud, imposition and misrepresentation, and from inducements to engage in unlawful or immoral employments or practices, the statute prescribes stringent rules and regulations with which all such agencies are required to comply and makes any failure to comply therewith or any misconduct of the licensee in conducting the business cause for revoking the license or refusing a new license." 216 N.W. at 324.

Re Estate of Peterson, 230 Minn. 478, 42 N.W.2d 59; Weatherston's A. M. Serv. v. Minn. M. L. I. Co., supra. Cf. Russell-Stewart, Inc. v. Birkett, 24 Misc. 2d 528, 201 N.Y.S.2d 687. We fail to see any public policy to be served by declaring this transaction illegal and void.[11] The agreed services were rendered. They are entitled to be compensated.

Judgment affirmed.

VAN OOSTERHOUT, Circuit Judge (concurring in part and dissenting in part).

I concur with the majority opinion to the extent that it affirms the judgment for plaintiff on the $10,000 Count II recruiting fee.

I respectfully dissent from the majority holding affirming the $4,125 Count I judgment. I agree with the majority's Count I determination that no valid modification of the employment contract has been pleaded or proved and likewise concur in the holding that the employment contract sued upon is complete and integrated.

My point of departure is upon the issue of whether the written contract providing for compensation is ambiguous. Unlike my brethren, I cannot accept the view that such contract, which is set out in the footnote 1 of the majority opinion, is ambiguous. Paragraph 2 of the employment contract provides that Balch shall assist his employer in the areas of management and personnel and that (1) such duties shall be performed at times requested by the corporation and that Balch will hold himself available for consultation; and (2) Balch shall devote a *minimum* of twenty-four days per year to such duties.

I can find nothing whatsoever in such language which fairly limits Balch's per-

formance to twenty-four days a year. Plaintiffs are in effect seeking to have the word "minimum" interpreted as maximum. I can find no reasonable basis for such a construction.

Paragraph 3 of the contract gives either party a right to terminate on thirty days notice. Thus, if plaintiff is called upon to do more work than he thinks he should do, he is in a position to promptly terminate the contract.

The provision for compensation covered in paragraph 4 appears to be entirely clear-cut and unambiguous. Provision is made for payment of $300 per month on the last day of each month for any services called for by the contract. Parenthetically, I note that the trial court made a finding that in addition to the contract compensation Balch by a separate agreement obtained certain stock option rights. It is hard to conceive how the compensation provision of the contract could be stated in any clearer or more precise manner. It is apparent that the compensation paragraph by its terms covers the full and complete compensation for services Balch was required to perform under the contract.

The Minnesota Supreme Court in applying the integration rule in Lehman v. Stout, 261 Minn. 384, 112 N.W.2d 640, 644, states in part:

" 'The rule has become mere hornbook law that, where parties have reduced their contract to writing, the contract may not be proved by prior or contemporaneous utterances or writings and that these are entirely immaterial for the purpose of determining what the terms of the contract are. * * * Antecedent and contemporaneous utterances are excluded, not because they are lacking in evidentiary value, but because the law for

---

11. In Hart v. Bell, Minn., 222 Minn. 69, 23 N.W.2d 375, 379, 24 N.W.2d 41, the Minnesota Supreme Court said:
 "The element of illegality must also be of such a nature that to enforce or recognize a transaction tainted thereby would be clearly contrary to the public policy and welfare. Not every illegality

requires intervention for the preservation of public policy. * * * It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands."

substantive reasons declares that such matters shall not be shown. If the rule were otherwise, there would be an absurd futility in written contracts which it is the purpose of the parol evidence rule to prevent. \* \* \*' "

The issue of whether an ambiguity exists is one of law to be determined by the court. Eastmount Constr. Co. v. Transport Mfg. & Equip. Co., 8 Cir., 301 F.2d 34, 41. It is well-settled law that if the language used in the contract is plain, complete and unambiguous, the intention of the parties must be gathered from that language alone, no matter what the actual secret intentions of the parties may have been. 17 Am.Jur.2d, Contracts §§ 241 and 245. Kuhlmann v. Educational Publishers, Inc., 245 Minn. 171, 71 N.W.2d 889, 893; Jimmerson v. Troy Seed Co., 236 Minn. 395, 53 N.W.2d 273, 277; Matthews v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d 230, 232, 147 A.L.R. 147; Davis v. Liberty Mut. Ins. Co., 8 Cir., 308 F.2d 709, 711; Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. R., 8 Cir., 199 F.2d 725, 730.

The general rule, supported by overwhelming authority cited in footnotes, is thus stated in 17 Am.Jur.2d § 273:

> "The rule that the surrounding circumstances should be considered in determining the meaning of a contract and the intention of the parties thereto, as of the time of entering into the contract, is limited to cases where resort to such circumstances is made necessary by reason of the ambiguity and uncertainty of the contract language, and the rule does not apply where the language of a written agreement is plain and not susceptible of more than one meaning."

Of course, where material words have different established meanings, or where technical meanings are given to words in a trade or locality, resort may be had to parol evidence to show the meaning intended. I find nothing in our present case to indicate that any of the material words have any unusual or special meaning.

Plaintiff was an attorney and well-informed and experienced person. He participated in the drafting of the agreement. The rule for construing agreements most strongly against the draftsman does not arise unless an ambiguity exists which permits more than one reasonable construction and such rule is not to be favored over more primary rules of construction. See Saturn Oil & Gas Co. v. Northern Natural Gas Co., 8 Cir., 359 F.2d 297, 301.

I would hold that the employment contract involved in Count I is complete, integrated and unambiguous and that plaintiff is limited to the compensation provided in such contract. Hence, I would reverse the judgment entered for plaintiff on Count I.