LEMM v. SPARKS.

5-1662                                          321 S. W. 2d 388

Opinion delivered February 23, 1959.

[Rehearing denied March 30, 1959]

106

*Virgil Roach Moncrief* and *John W. Moncrief*, for appellant.

*Coleman, Gantt & Ramsay, E. Harley Cox, Jr.*, for appellee.

Ed. F. McFaddin, Associate Justice. The appellees (plaintiffs), J. W. Sparks and Herbert Hunter (doing business as Gregg Oil Company, a partnership), filed action against the appellants (defendants), George P. Lemm and Jerry Maiatico, to recover a claimed balance of $15,798.89 for labor and services alleged to be due under both written and oral contracts. In addition to a general denial, the defendants denied any oral contract, claimed that plaintiffs had not fully performed the written contract, and denied owing any amount to the plaintiffs. The jury's verdict was for the plaintiffs for $6,000.00; and defendants bring this appeal, assigning 25 errors. Most of these relate to instructions; and we group and dispose of the twenty-five points in suitable topic headings.

I. *The Alleged Oral Contract.* In 1956 John H. Hall acquired oil and gas leases on more than twelve thousand acres of land in the western part of Arkansas County, and was desirous of finding someone who would finance the drilling of exploratory wells. The territory was entirely "wildcat." Hall met the plaintiff, Hunter, who was anxious to do the actual drilling, if someone would finance the operations. Hunter's partner, Sparks, knew a Mr. Kibler in Washington, D. C., who, in turn, knew parties that might be induced to provide the finances. So Sparks and Hall went to Washington and were introduced to the defendants, Lemm (an attorney) and Maiatico (a building contractor). Hall sold Lemm and Maiatico leases covering ten thousand acres.

Lemm and Maiatico entered into a drilling contract with the Gregg Oil Company by which they agreed to pay Gregg Oil Company $18,000.00 for drilling the first well and $17,000.00 for drilling the second well. The location of each well was stated. Gregg Oil Company agreed, *inter alia,* to drill each well to a depth of 4200 feet ". . . unless oil and gas in paying quantities is encountered at a lesser depth," or unless it became impossible to drill because of the formation encountered. Also, Gregg Oil Company agreed, *inter alia,* to take three drill stem tests in each well and to ". . . take up to twenty side well cores."[1]

---

[1] We copy the entire drilling contract, omitting only the signatures:

"This Drilling Contract entered into this the 30th day of June, 1956, by and between JERRY MAIATICO and GEORGE P. LEMM as Joint owners hereinafter referred to as owner, and J. W. Sparks and H. Hunter, General Partners d/b/a GREGG OIL COMPANY of Gladewater, Texas, hereinafter referred to as Contractor.

"In connection with the drilling of a test well for Oil and/or Gas, CONTRACTOR agrees to furnish necessary Rotary Drilling Rig, Derrick, drill pipe, drill collars, and all necessary drilling equipment for to test a well to a depth of 4,200 feet.

"Contractor agrees to furnish and drill a test well on your lease at the location as shown on the attached Plat in the NE¼ of NE¼ of Section 18, Range 6W, Township 58, Arkansas County, Arkansas, and to drill the same to a depth of 4,200 feet from the surface unless oil and gas in paying quantities is encountered at a lesser depth, or unless a formation such as cannot be economically drilled with a standard Rotary and Standard Hard Rock bits should be encountered at a lesser depth, such formation could be Paleozic in that area.

"Contractor understands this to be a turn key job down to oil string casing point and agrees to furnish in addition to drilling equipment, all

The plaintiffs claimed that immediately after the signing of the drilling contract, Sparks told the defendants, Lemm and Maiatico, that if a showing of oil should be encountered in either of the wells covered by the contract, then considerable additional expenses would be entailed, such as casing, cementing, delay time, etc.; and plaintiffs claimed that an oral contract was made between the parties as to such additional items of expense.[2] The first well provided for in the contract was duly commenced within the time and at the location stated in the contract. John H. Hall was at the drilling location during most of the time. When the well reached a depth of about 1600 feet there was a slight showing of oil. The driller obtained cuttings and

labor, fuel, water, State drilling permit, Insurance, drilling mud and chemicals, to furnish pits and roads and to clear location. All necessary Surface Pipe, the Cement and Cementing Surface to set said surface pipe.

"To furnish equipment and take three drill stem tests, to test likely formations if prospective formations are encountered. To furnish 24 hours' rig time for circulating samples and to keep an accurate log and samples of formations encountered. To furnish an electric log and take up to twenty sidewall cores.

"Consideration for this contract is to be $18,000.00. Money to be placed in Escrow to be paid out as follows: One third of $6,000 when a depth of one thousand feet has been reached, balance to be paid when Electric Log has been run and sidewall cores taken.

"It is understood that this first well will be commenced on or before August 14, 1956 and that Contractor will pursue with due dilligence the drilling of same. Contractor is ready to furnish progress reports to the Owners or their duly appointed representative.

"It is further agreed and understood that Well No. 2 near the center of Section 11, as shown on the Plat will be drilling immediately following the completion of No. 1 and to be drilled by Contract under same terms and conditions as No. 1, except the consideration is to be $17,000 on No. 2."

[2] Here is Plaintiff Sparks' testimony (as abstracted by defendants) on this matter of the oral contract:

"On the day we signed that contract, Mr. Lemm had prepared it and we were in Mr. Maiatico's office and Mr. Maiatico and I had lengthy conversation. Mr. Lemm was in and out of the office as he had several people calling on him. In the course of the conversation it came up that after the well was completed and after we had fulfilled our contract, and additional basis we would work on and at that time that anything run through our books, which is customarily with any contractor and this is not an exception, we would charge twenty-five per cent on the amount that went through our books.

"That was the agreement with Mr. Lemm and Mr. Maiatico, and it would take care of our overhead and expense of supervision and other expenses."

showed them to Hall,[3] thinking that he was representing Lemm and Maiatico. Here is Hunter's testimony as to the occurrence:

"We were drilling in an unproven area and we didn't know what we might run into at any depth so when that cutting came to the surface oil was on top of the pit—not in large quantities but a good large scum. Dr. Hall was there . . . We looked that over and then we carefully looked at the next hundred feet that we drilled just a little at a time . . . we would circulate out and watch it, . . . and it looked like it was possible that we might have something worth keeping at that point. We had the samples and we put them in individual bags and numbered the depth that they came from and turned them over to them, and Dr. Hall recommended to set up pipe at that depth; and I said you get in touch with the people in Washington but we have a contract to keep here, to go deeper than this unless we do get orders to set pipe; . . . I am going to continue to make hole until I get orders to stop, so we continued drilling . . ."

When Mr. Lemm came down from Washington the well was at a depth of 3917 feet. Lemm decided to set casing and test the horizons[4] between 1600 and 1700 feet. At all events, beginning on August 31st and continuing until the second well was abandoned[5] the plaintiffs spent thousands of dollars for casing, cementing,

---

[3] At various places in the testimony Hall is referred to as "Dr. Hall"; and Sparks referred to him as a geologist who "sat on the well" for Lemm and Maiatico. Hall said he held a Master of Science degree from Marshall College in Baltimore, Maryland. Hall said he was not the agent of Lemm and Maiatico; but his participation, and the issue as to whether there was a "holding out" as to agency, are matters that will be mentioned in Topic III, *infra*.

[4] Hunter testified as to this, as abstracted by the defendants:

"Mr. Lemm was in my room in Hotel Pines when we discussed testing of well that the written contract didn't cover, and I called his attention that when pipe was set and testing then his expenses would really start and that they were going to be considerably more than they had been; and we would have to pay for that material that would be necessary as they were obtained and would require advances of money and I made a statement and submitted to them a copy . . ."

[5] The second well covered by the written contract was drilled likewise without commercial production. In spite of all the expenditures, oil was not produced in commercial quantities from either of the wells.

shut-down time, etc.; so that the written contract calling for $35,000.00 for two wells grew (with the disputed oral contract) into expenditures totalling in excess of $100,000.00. The defendants do not deny that they have paid the plaintiffs a total of $96,500.00 on the two wells; and the plaintiffs claim that there remains due a balance of $15,798.89.

Thus, we come to the matter of the oral contract for casing, cementing, shut-down time, etc. It is well recognized that when the written contract is plain and unambiguous and complete in its terms, then parol contemporaneous evidence is inadmissible to contradict or vary the terms of the valid written instrument. (*Outcault Adv. Co.* v. *Bradley,* 105 Ark. 50, 150 S. W. 148; *Anderson* v. *Wainwright,* 67 Ark. 62, 53 S. W. 566; and *Cox* v. *Smith,* 99 Ark. 218, 138 S. W. 978.) But, here, it is not a matter of a contemporaneous oral contract *varying* the terms of a written contract; rather, this is a case of an oral contract being in addition to the written contract. As such, the evidence was admissible concerning the oral contract. *(Burgie* v. *Bailey,* 91 Ark. 383, 121 S. W. 266, 18 Ann. Cas. 389.) In *Cox* v. *Smith,* 99 Ark. 218, 138 S. W. 978, Mr. Justice FRAUENTHAL stated the rule: ". . . a separate verbal agreement relating to a matter not embraced in the written contract may be proved by parol testimony."

Certainly the parties had some sort of understanding in addition to the written contract heretofore copied, because it only required the defendants to pay a total of $35,000.00, and yet they do not deny having paid the plaintiffs a total of $96,950.00. Some explanation was proper as to the payments; and the evidence established that labor, services and materials were furnished under an oral contract in addition to the written contract. So the Court was correct in allowing evidence to be heard concerning the oral contract.

II. *Plaintiffs' Instruction No. 1.* Over the defendants' objection, the Court instructed the jury:

"If you find from a preponderance of the evidence, that the plaintiffs and defendants entered into a con-

tract in writing for the plaintiffs to drill on behalf of the defendants two oil wells in Arkansas County, Arkansas, and that after that contract in writing the plaintiffs and defendants entered into one or more additional agreements orally, and if you find that the plaintiffs have completed all their obligations under these contracts, and if you further find that there is a balance remaining unpaid under these contracts when considered together, then you shall find for the plaintiffs in the amount remaining unpaid, if any.''[6]

Much of what we have said in Topic I, *supra,* applies to this instruction. The defendants say that this instruction was a ''roving commission'' to the jury; but we do not consider the instruction fatal as against the defendants' objections. The plaintiffs assumed the tremendous burden of establishing that they had completed ''. . . all of their obligations under these contracts.'' They filed an itemized account of thirteen single-spaced typewritten pages, which purported to show each item of debit and credit from July 1956 (the signing of the written contract) to and including November 14, 1956, which was after the abandonment of the second well. This account showed a claimed balance due plaintiffs of $15,798.89. The plaintiffs were interrogated at length about the various items; the jury had the account and all evidence about it, together with the instruction No. 1; and the verdict of the jury was for the plaintiffs for $6,000.00. There was substantial evidence to sustain the verdict.

[6] The defendants' objection to this instruction reads:
"Defendants and each of them objected generally to plaintiffs' requested instruction number one and objected specifically to it because there is no evidence that plaintiffs completed all their obligations under the written contract. This instruction infers that an alleged oral contract claimed by plaintiffs to have been entered into on the same day the written contract was executed and on the same occasion was a subsequent oral contract and allows the jury to so infer or find, and the instruction is uncertain, indefinite, confusing, and misleading in saying 'one or more additional agreements orally', and plaintiffs' pleadings do not declare on such additional oral contracts and the instruction does not point out such oral contract, nor what they were or what they covered or pertained to. The instruction does not contain any definite, or certain or proper guide and is a roving commission, confusing and misleading and vests in the jury the right to decide questions of law. The instruction infers there was one or more additional contracts and that there was one or more oral contracts."

III. *Waiver.* During the presentation of the evidence, and also in several requested instructions, defendants insisted that the plaintiffs had never completely performed the written contract. Some instances of non-performance, as urged by the defendants, were: (a) the first well was only drilled to 3917 feet instead of 4200 feet; and (b) the written contract called for three drill stem tests in each well and none was made. Because of these matters (and others of which these are typical), defendants urged that an instructed verdict should have been given in their favor.

The defendants also requested an instruction which read:

"The Court instructs the jury that under the contract sued on by plaintiffs, it was the duty of plaintiffs to make three drill stem tests in hole or well number 1 and it was also the duty and obligation of the plaintiffs, Hunter and Sparks, to make three drill stem tests in well or hole number 2, and it was the duty and obligation of plaintiffs to take twenty side wall cores in well or hole number 1, and it was the duty and obligation of plaintiffs to take twenty side wall cores in hole or well number 2, . . ."

The Court refused the instruction as requested; but modified it and gave it by adding these words at the conclusion of the requested instruction:

". . . unless you further find from a preponderance of the testimony that the defendants had an authorized agent who had the authority to waive such conditions, unless you further find the defendants themselves waived such conditions."

Likewise, in another instruction, the defendants insisted that the plaintiffs had not located the second well at the place provided in the contract; and the Court added these words to the requested instruction: ". . . unless the provisions of the contract were waived by the defendants or some person authorized to make such change in the contract."

To both of these additions and modifications, the defendants most strenuously objected;[7] but we see no error in the modifications made by the Court. The defendants could waive the provisions for depth, drill stem testing, location, etc. A contract for the drilling of an oil well, while involving a highly technical and skilled undertaking, is, nevertheless, to be interpreted by the same rules used in interpreting other contracts.[8] Whether Hall was the implied agent of the defendants is to be determined by the same rules as in other cases of agency by holding out.[9] There was testimony that when the well reached the depth of 3917 feet Mr. Lemm directed that casing be set so the horizons could be tested from 1600 to 1700 feet. Because of the absence of clear wording in the contract, a question of fact was made, as to whether the driller was to make the tests and side wall cores on his own initiative, or was to do those things only when directed by the defendants or their agent. The question of whether the plaintiffs exercised due and proper care and skill in drilling the well was a matter for the jury to decide. Also, the matter of waiver as to further depth after testing was, under all the evidence, a matter for the jury to decide.

On this matter of waiver, the defendants insist that the Court should not have used the words, "waive" or "waiver," without defining these words. The defendants say, ". . . it leaves to the jury the determina-

[7] The objections covered several pages in the transcript, but we do not summarize them because they ultimately involve the point now discussed.

[8] In Summers on "Oil and Gas" (Permanent Edition), Vol. 4 § 682, the text states: "The general rules of construction which are applied in ascertaining the meaning of other contracts are applicable to the construction and interpretation of contracts for the drilling of oil and gas wells." See also Chapter 30 of "Oil and Gas Rights" by Morrison-Desoto. In 58 C.J.S. 602, "Mines and Minerals" § 225, in discussing contracts for testing or working, cases from many jurisdictions are cited to sustain this textual statement: "The rules governing the construction and operation of contracts generally . . . usually apply in construing and determining the operation of contracts for the testing or working of a mine or mineral deposit or for services to be rendered in connection with the operation of a mine or well . . ."

[9] In 2 C.J.S. page 1048 "Agency" § 23, the text reads: "Agency may be implied where one by his conduct holds out another as his agent, or thereby invests him with apparent or ostensible authority as agent . . ."

tion of the legal elements of waiver and the legal elements of what is necessary to constitute 'waive,' 'waived,' and 'waiver.' " If the defendants had thought that the words, "waive" or "waiver," were so highly technical that they needed definition, then the defendants should have requested an instruction to that effect. They did not offer any such instruction, and therefore, are not in good position to complain about the use of the word.[10]

We find nothing that makes the use of the words, "waiver" or "waive," in this case different from the use of the words, "waive" or "waiver," in any other matter of life. Webster's International Dictionary defines "waiver" as, "An act of waiving or intentionally relinquishing or abandoning some known right." That is the general definition. Black's Law Dictionary defines "waiver" as, "The intentional or voluntary relinquishment of a known right . . . or when one dispenses with the performance of something he is entitled to exact.[11] It will be observed that the definition in Webster's Dictionary is practically the same as that in the Law Dictionary.[12] This fact, coupled with the fact that the defendants did not offer an instruction defining "waiver," disposes of the objection which they made to the instruction as given.

## CONCLUSION

As previously stated, there are twenty-five assignments urged by the appellants (defendants). We have

[10] In 88 C.J.S. page 1063, "Trial" § 392, the text reads: "A party desiring terms or phrases to be defined or explained must ordinarily request an instruction to such effect before it becomes the duty of the Court to define or explain them."

[11] In *Sirmon* v. *Roberts*, 209 Ark. 586, 191 S. W. 2d 824, Chief Justice Griffin Smith gave a splendid discussion of the word, "waiver".

[12] In 53 Am. Jur. p. 489, "Trial" § 630, the text states: "It is not necessary for a Court in its charge to define words in common use which are applied by the trial Judge in his instructions in their conventional sense, since the jury must be presumed to know their general and proper significance."

reviewed all of them, and conclude that they do not require a reversal of the judgment.

Affirmed.

JOHNSON, J., dissents.