**DUNLOP TIRE AND RUBBER CORPORATION, Appellant,**

v.

**Fred THOMPSON, et al., d/b/a etc., Appellees.**

**No. 16299.**

United States Court of Appeals Eighth Circuit.

Dec. 24, 1959.

Bernard Whetstone, El Dorado, Ark., for appellant.

Robert C. Compton, El Dorado, Ark., for appellees.

Before SANBORN, VAN OOSTER-HOUT and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

Plaintiff Dunlop Tire and Rubber Corporation, of New York, instituted this suit to recover $6,467.61, the balance due, including interest, for tires sold to defendants, citizens of Arkansas. The correctness of plaintiff's account is not in dispute; the issue litigated was whether defendants were entitled to an offset

in the sum of $6,392.58 for adjustments claimed to have been made by them with their customers on defective tires. Plaintiff unsuccessfully moved the court for a directed verdict for the full amount sued for. The issue was submitted to the jury which found for plaintiff in the amount of $2,950, thus in effect allowing defendants a portion of their claimed offset.

Here, as in the trial court, plaintiff contends that the evidence was wholly insufficient to create a jury issue on defendants' pleaded offset. In defense of the counterclaim or set-off, plaintiff set up a written contract designated "Dunlop-Dealer Franchise," dated March 4, 1957, which provided inter alia:

> "7. Adjustments: The Dealer shall refer to Dunlop, in accordance with procedure established by Dunlop, all claims for adjustment or replacement of Dunlop Tires, Tubes or Batteries and shall await Dunlop's approval and instructions before making any adjustment or replacement for account of Dunlop. Any adjustments approved by Dunlop are handled for the user through the Dealer. When approved adjustments are handled for the customer through the Dealer, Dunlop will allow the Dealer a merchandise credit equal to 10% of price of the adjustment charged to the customer, the Dealer to pay transportation charges. It is understood that the Dealer is not authorized to make adjustments on behalf of Dunlop nor is the Dealer authorized to guarantee any product sold hereunder, except as set forth in Dunlop's written Guarantee or adjustment policy in effect at the time.

> "10. No Modification: This franchise, which supersedes and cancels all other franchises referring to the subject matter hereof except the Dealer's obligation to make full payment for any merchandise purchased thereunder, Sets Forth the Entire Franchise between the Parties Hereto and Has Been Entered into Only Under the Inducements and Representations Herein Expressed. * *

> "This franchise may be signed without alteration of printed condition and/or cancelled in its entirety by the General Sales Manager, Division Manager or any officer of Dunlop, but its provisions cannot be altered, waived or modified except in writing signed by the Dealer and by Dunlop's General Sales Manager, or any officer of Dunlop."

It is defendants' position that paragraph 7, which clearly sets out the procedures to be followed with respect to claims for adjustment or replacement of Dunlop tires, was changed or enlarged upon by an oral contract claimed to have been entered into after the execution of the written contract. In defendants' original "set-off and counterclaim" filed August 4, 1958, they pleaded that the tires were purchased pursuant to representations of quality made by one Pete Wisner, plaintiff's agent; that the tires purchased by defendants were defective, as the result of which they became obligated to make adjustments to their customers in the amount of their claimed offset. In their "Amendment to Answer, Set-Off and Counterclaim" filed October 1, 1958, defendants alleged that after the March 4th contract was signed the parties entered into an agreement, "the same being in addition to the original contract, and being a change and innovation in so far as Paragraphs 5, 7 and 8 of the original contract is involved, and being an enlargement thereof, the said innovation being as follows:" Then followed allegations to the effect that it was agreed defendants could make adjustments as they saw fit and advise plaintiff and plaintiff would accept the adjustments so made and give defendants credit therefor.

▮▮▮ The rules of law applicable to the issues before us have universal recognition and may be stated simply:[1] All antecedent and contemporaneous negoti-

---

1. The parties have proceeded on the premise that Arkansas law applies.

ations, conversations and representations are deemed to have been merged into the written agreement of the parties and it is conclusively presumed that the whole agreement between the parties was reduced to writing. Jeter v. Windle, Ark., 319 S.W.2d 825, 827; Cox v. Smith, 99 Ark. 218, 138 S.W. 978; 17 C.J.S. Contracts § 381; 12 Am.Jur. Contracts § 428. In the absence of fraud or mistake, where a written contract is plain, unambiguous and complete in its terms, parol evidence may not be used to contradict, vary or add to any of its provisions. Jeter v. Windle, supra, 319 S.W.2d at page 827; Cox v. Smith, supra, at page 980; 32 C.J.S. Evidence § 901; 12 Am.Jur. Contracts § 428. Professor Corbin has stated the rule in this manner:

> "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. This is in substance what is called the 'parol evidence rule', a rule that scarcely deserves to be called a rule of evidence of any kind, and a rule that is as truly applicable to written evidence as to parol evidence." Vol. 3, Corbin on Contracts, 1951 Ed. § 573, p. 215.

Parties to an unperformed or executory contract may change or modify it by mutual consent, and resort may be had to any competent evidence, parol or otherwise, for the purpose of establishing, by clear and convincing proof, a subsequent novation or modification of the written contract. Lemm v. Sparks, Ark., 321 S.W.2d 388, 390; Elkins v. Henry Vogt Mach. Co., 125 Ark. 6, 187 S.W. 663, 664; Corbin on Contracts, Vol. 3, § 574; 12 Am.Jur. Contracts § 428; 17 C.J.S. Contracts § 373.

■■■ We have carefully reviewed the evidence and, giving the defendants the benefit of all favorable inferences that legitimately may be drawn therefrom, we are satisfied that it affords absolutely no proof that any of the terms of the written contract were modified by a subsequent mutual agreement of the parties.

Fred Thompson, principal owner of defendants' business, testified that on March 4, 1957, and shortly after the written contract was signed by him, he had this conversation with Mr. Wisner, plaintiff's sales representative:

> "I would say the day I signed the contract I said, 'That is fine, Mr. Wisner. I want you and my brother to go down and call on one of my best customers. I want you to tell him our deal. I want you to tell him the type of deal that you give us and the responsibility you have placed on me and I am damn sure going to take care of my end of it if it is within my power.'"

Mr. Cross, manager of the business known as "Bear Brand Roofing Company" was the customer referred to in Thompson's quoted testimony, supra. Cross testified:

> "Mr. Wisner then started and gave me the sales talk that they had an improved tire at that time and that they were strictly behind them and that it was unconditionally guaranteed and that they were setting Fred Thompson Buick Company up as distributor for their tires and if there was anything wrong with any tire I purchased, that I wouldn't have to go anywhere but to the distributor for an adjustment * * *. The only thing that he told me in the way of guarantee that is, for an adjustment, that anything that was wrong with the tire that I had that it would be taken care of with Fred Thompson Buick Company."

It is defendants' position that the foregoing testimony was sufficient in law to permit the jury to find that paragraph 7 of the written contract had been modified by mutual agreement of the parties so as to authorize defendants to make adjustments directly with their customers,

with subsequent reimbursement to defendants by plaintiff for adjustments so made.

Aside from any discussion of Wisner's authority to so modify the written contract,[2] or of the question of whether defendants successfully established the existence of this new agreement by clear and convincing proof,[3] a further review of Fred Thompson's own testimony conclusively demonstrates that the above conversations had on March 4 were but a continuation or reiteration of negotiations antedating the execution of the written contract. Thus, Mr. Thompson testified:

"Prior to March 4, 1957, for a period of several weeks I had been negotiating with Dunlop through its agents, Mr. Wisner and Mr. Edwards (Division Manager). * * * Before March 4th, I talked with Edwards over the telephone. * * * We discussed thoroughly over the telephone before March 4, 1957, their policy of adjustment. I told Mr. Edwards that Wisner had told me about their policy on adjustments. Mr. Edwards knew at that time that I was considering signing a dealer's franchise agreement with him and we discussed that possibility. I had made up my mind at that time that I was going to sign with them. * * *

"Q. Now, all of the understanding with reference to how the adjustments would be handled, were agreed upon between you and Mr. Edwards before March 4th, 1957, weren't they? A. Yes, sir. No, I wouldn't say before. We discussed that about 30 days, the types of adjustments and so forth.

"Q. You wanted to be very careful about what their policy was with reference to adjustments before you entered into any deal with them, didn't you? A. Yes, sir.

"Q. You wanted also to be very careful with all of the other different phases of the arrangements that you were going to make with them, didn't you? A. Yes, sir.

"Q. Then when you had that understanding—after you had completed your understanding, you did sign up, didn't you? A. Yes, sir.

"Q. When you signed this agreement, did you expect to be bound by it, by what the agreement said? A. So far as being their dealer, yes.

"Q. But you did not expect to be bound by the terms with reference to the adjustments—with the provisions with reference to adjustments in the contract? A. No, sir.

"Q. This part down here where it says the contract cannot be changed or modified except in writing by some officer of the company. Did you expect to be bound by that? A. They told me I wouldn't.

"Q. And you did not expect to be bound by that. Is that right? A. We sent the representative of Dunlop down to Mr. Cross, our customer, and let him present our case, what we would do. We would supply him with these tires, and we would make adjustments as he outlined to Mr. Cross.

"Q. In other words, when you signed on March 4, that was just a conditional tentative signing. Is that right? You didn't expect to be bound by them until later. Is that what you're saying? A. Of course I accepted their deal when I signed the contract."

Mr. Thompson's testimony, in response to questions by the Court, was as follows:

"Q. [By the Court] As I understand, Wisner brought this contract and you signed it and then he took the contract and supposedly

2. See Clause 10, quoted supra, 273 F.2d at page 398.

3. See Clark v. Duncan, 214 Ark. 83, 214 S.W.2d 493; Terral v. Poe, 190 Ark. 346,

79 S.W.2d 69, 71; 12 Am.Jur. Contracts § 432; 17 C.J.S. Contracts §§ 607, 608, and compare Lemm v. Sparks, Ark., 321 S.W.2d 388, 392.

sent it to Mr. Edwards? A. That's right.

"Q. And you didn't get it back? A. That's right.

"Q. Now, you are talking about this Bear Brand sale. Do you recall when that sale was made? A. The date that I signed the contract.

"Q. You mean on March 4th? A. Yes, sir, whatever day Mr. Wisner was there. I sent he and my brother——

"Q. I see. I was just trying to get it straight, the sequence of the thing. You said you had some conversation with Mr. Edwards who is listed here as Division Manager. When was the conversation you had with him, the first conversation about your contract with him in reference to the sale to the Bear Brand people? A. I discussed the tire deal with Mr. Edwards, that is, him being the Division Manager, we talked two or three times a week over the telephone.

"Q. Did you talk to him prior to the signing of this contract? A. Oh, yes, sir.

"Q. After you signed the contract what did you talk with him about? A. We discussed adjustments and so forth and, of course, he said, 'You all take care of the customer.'"

■■ Although defendants contend that their right to recover is based upon a new contract which superseded the provisions of the written agreement relating to adjustments, and that "there is no question presented regarding the variation of a written contract by parol evidence * * *," the record made does not bear them out. The real purport of defendants' evidence is that at all times prior to and contemporaneously with the execution of the written contract by defendants, their understanding of the agreement was that they had full authority to act independently in making adjustments directly with their tire customers—a position diametrically opposed to their authority under the written contract. Thus, by insisting that the Thompson version of the policy on adjustments was the agreement throughout, defendants in effect seek to impeach the written contract by parol evidence, urging that it did not express the true intent of the parties.[4] This they cannot do. Fred Thompson, an experienced businessman, who was the moving force for defendants in negotiating the contract, was under compulsion to have the written contract accurately express the true agreement of the parties. Having failed to do so, the defendants cannot now rely upon prior and contemporaneous negotiations, because "it is conclusively presumed that the whole agreement of the parties, and the extent and manner of their undertaking, were reduced to writing." Jeter v. Windle, Ark., 319 S.W.2d 825, 827, quoting Wilson v. Nugent, 174 Ark. 1115, 299 S.W. 18, 21.

■ Concededly, the defendants failed to comply with the written contract in making adjustment of defective tires, and since, for the purpose of this litigation, defendants' claimed adjustments must be deemed to have been gratuitously made, plaintiff was entitled to a directed verdict for the full amount of defendants' unpaid account, $6,467.61, and to have judgment entered upon such a verdict for that amount and costs.

■ Since the plaintiff made no motion for judgment notwithstanding the verdict of the jury, we are precluded from directing the entry of the judgment to which we hold it was entitled. Johnson v. New York, New Haven & Hartford R. Co., 344 U.S. 48, 54, 73 S.Ct. 125, 97 L.Ed. 77. The judgment appealed from is reversed and the case is remanded for a new trial.

4. Compare Lemm v. Sparks, Ark., 321 S.W.2d 388, 392.