305 F.2d 38
 LOCAL 978, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF
AMERICA, AFL-CIO and Carpenters' District Council
of Greater Kansas City and Vicinity, Appellants,
v.
Kenneth MARKWELL and William Hartz, Partners, d/b/a Markwell
and Hartz, Contractors, Appellees.
 No. 16962.
 United States Court of Appeals Eighth Circuit.
 July 11, 1962.
 
 Harrry H. Craig, St. Louis, Mo., for appellants; Gibson Langsdale, Kansas City, Mo., with him on the brief.
 Wells T. Lovett, Owensboro, Ky., for appellees; Lovett & Howeard, Owensboro, Ky., and Allen, Woolsey & Fisher, Springfield, Mo., with him on the brief.
 Before VOGEL, VAN OOSTERHOUT and MATTHES, Circuit Judges.
 MATTHES, Circuit Judge.
 
 
 1
 This action for damages under 303 of the Labor-Management Relations Act of 1947, as amended, (29 U.S.C.A. 187), was instituted in the United States District Court for the Western District of Missouri by Kenneth Markwell and William Hartz, a co-partnership, doing business as Markwell and Hartz, Contractors.[1]
 
 
 2
 The original defendants were five voluntary unincorporated labor organizations, namely: (1), Local 978, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; (2), Local 676, International Hod Carriers, Building and Common Laborers Union of America, AFL-CIO; (3), Local 16-16-B, International Union of Operating Engineers; (4), Local 178, United Association of Journeymen & Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO; and (5), Carpenters' District Council of Greater Kansas City and Vicinity.
 
 
 3
 The trial was before a jury, and at the close of all of the evidence the defendants made separate motions for directed verdict. The court sustained the motions of the Operating Engineers and the Plumbers but reserved ruling on the motions of the Laborers and the two Carpenter Associations. The jury found in favor of the plaintiffs and against the three defendants remaining in the case and assessed plaintiffs' damages at $50,000. None of these defendants filed after-trial motions under Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., neither does the record disclose that the trial court expressly denied the motions for directed verdict upon which ruling had been reserved; however, formal judgment was entered on the verdict, thus implying a denial of the motions for directed verdict. The two Carpenter Associations are the only defendants who have appealed to this court.[2]
 
 
 4
 Plaintiffs' cause of action was premised upon alleged unlawful picketing by defendant unions at the site of a construction project near Springfield, Missouri, where plaintiffs were engaged in constructing alterations and additions to the Northwest Sewage Treatment Plant, under contract with the City of Springfield. Plaintiffs' complaint alleged, and the cause was submitted under the theory of, violations of various subsections of 303 of the Act 29 U.S.C.A. 187(a) (1), (2), and (4), which in pertinent part provide:
 
 
 5
 '( a) It shall be unlawful * * * for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where on object thereof is--
 
 
 6
 '(1) forcing or requiring * * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;
 
 
 7
 '(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
 
 
 8
 '(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing forming such work * * *'
 
 
 9
 The broad question presented by this appeal is whether the evidence was sufficient to present a question of fact for the jury to resolve. Appellants contend that the evidence establishes that the picketing activities complained of were, as a matter of law, legal, and not proscribed by 303 of the Act, and that, therefore, their motions for directed verdict should have been sustained. More precisely, appellants contend that 303, and its counterpart covering unfair labor practices, 8(b)(4), 29 U.S.C.A. 158(b)(4), were not designed to prohibit lawful primary activity; that the evidence conclusively establishes that all activities of defendant unions were directed at a primary dispute with plaintiffs; that all picketing was confined to the primary situs of the dispute, and at the only situs in Missouri where plaintiffs were doing business; and that there was no evidence of secondary picketing of neutral employers. In addition, as to 187(a)(4), appellants contend that there was no 'jurisdictional dispute' within the meaning of the Act.
 
 
 10
 With these contentions in mind, we briefly review the evidence.
 
 
 11
 Plaintiffs are Memphis, Tennessee contractors, and prior to the contract in question their construction projects were in the main confined to southern areas of the United States. In July, 1957, they were the successful bidders on the Northwest Sewage Plant project, and immediately thereafter an officer of the Operating Engineers Union and Secretary of the 'building Trades Council'[3] of Springfield, contacted plaintiffs in reference to employment of local AFL-CIO union men on the job. In August, plaintiffs met with various representatives of the separate craft unions, and although there is a dispute as to what transpired at this meeting, there is evidence from which the jury could have found that plaintiffs did agree to use the local AFL-CIO trade unions in filling requirements for construction men, apart from a few 'key men' they wished to bring with them from Memphis.[4]
 
 
 12
 On August 15, 1957, two of plaintiffs' employees, not members of the Carpenters' Union, began building a shed at the construction site, and this union offered to accept one of the men in the local AFL-CIO organization. Misunderstandings and disputes began, and negotiations broke down. Throughout the negotiations, the defendants 'made it perfectly plain that they were seeking two things. First, that none but members of their organizations be employed. Second, that traditional jurisdictional lines be observed so that carpenters do only the work of carpenters and not the work of plumbers, etc.' There is evidence that representatives of the interested labor organizations made statements to the effect that unless the job was AFL-CIO 'we can starve you out; we can put a banner up out there, shut off your concrete and materials to where you can't operate this job' and that 'You won't get any electricians, or any other craftsmen to cross the picket line.'
 
 
 13
 It appears that plaintiffs employed additional men who were not members of the unions affiliated with the 'Building Trades Council,' and that on August 23, 1957, plaintiffs signed a labor agreement with another organization known as the 'United Construction Workers,' an affiliate of the United Mine Workers.[5]
 
 
 14
 Three days later and on August 26, defendants began picketing the only entrance to the construction site with a sign reading as follows:
 
 
 15
 'A.F. of L. Carpenters not employed, Markwell, Hartz, Construction Company, Local Union 978, Kansas City District Council.'
 
 
 16
 It is conceded that at all times the picketing was peaceful, that it was confined to the construction site and that no neutral employers were picketed. Eleven of plaintiffs' employees were working at the site when picketing began, and all continued to work throughout the 42 days of picketing activity. However, the picketing was successful from the unions' standpoint, in that employees of various suppliers honored the picket line and refused to make deliveries or perform services for plaintiffs, and the picket line was maintained until October 22, when it was enjoined by an order of the United States District Court.[6]
 
 
 17
 There was evidence of five different incidents at the picket line which successfully prevented plaintiffs from receiving needed services and supplies. They are briefly summarized as follows:
 
 
 18
 (A) On the first day of picketing, a crew of power line workers of the City of Springfield appeared to re-locate power lines within the construction area, but work was stopped by the foreman of the crew, who, according to the record, stated: 'We were all union men; we wouldn't work behind a picket line.'
 
 
 19
 (B) on the first day of picketing an employee-driver of the Southwest Plumbing & Heating Company, apparently carrying supplies, refused to drive through the picket line.
 
 
 20
 (C) Another truck driver, this time an employee of the Anton-Luce Electric Company, stopped short of the picket line and refused to continue on to the construction site.
 
 
 21
 (D) Again, on the first day of picketing, a driver for the Garrett Construction Company, carrying a load of readymixed concrete, was ultimately ordered by his employer to leave without making delivery of the concrete.
 
 
 22
 (E) Several weeks after picketing began, a driver for the Frisco Transportation Company honored the picket line, and his materials were unloaded and delivered by plaintiffs' own employees.
 
 
 23
 Apparently there was no picketing by defendants after normal working hours and plaintiffs in fact managed to proceed to some extent with the project by having their employees work at night, driving rented trucks in order to bring materials and supplies onto the job site.
 
 
 24
 It was admitted by appellants that they were not, at any time, the representatives of plaintiffs' employees or certified by the National Labor Relations Board as representatives of such employees under the provisions of 9 (29 U.S.C.A. 159) of the Act. See 187 (a)(2). It was also admitted that plaintiffs were not 'failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative' for their employees. See 187(a)(4).
 
 
 25
 Under the evidence viewed in the light most favorable to plaintiffs, the legislative history of the Act, and decisional law which we consider as controlling, we must rule that there was no evidence to support a finding that the activities and conduct of the appellants constituted secondary boycott activities and that this issue should not have been submitted to the jury.
 
 
 26
 A literal reading of 158(b) and 187(a) would seemingly impel the conclusion that all activities of labor organizations which induce or encourage the employees of any employer to cease doing business with any other person, regardless of the location of such activities, would be unlawful-- in other words, that picketing at the primary employer's premises, otherwise lawful, would become illegal when employees of neutral employers honored the picket line. In neither of the above mentioned statutes is the situs of the picketing pxpressly mentioned or designated as a factor in determining whether the union's activity constitutes conduct proscribed therein, but we are satisfied that this is an element that must be read into 158(b)(4) and 187(a). This conclusion finds support upon consideration of the Act in its entirety, its legislative history, and decisional law in a number of cases where the courts were dealing with alleged secondary boycott activities. It should be remembered that 13 of the Act, 29 U.S.C.A. 163, provides:
 
 
 27
 '163. Right to strike preserved
 
 
 28
 'Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.'
 
 
 29
 A legitimate expectation of any labor organization which pickets an employer with whom it has a primary dispute is that all persons will honor the picket line, including employees of neutral employers making deliveries of supplies or performing services for the primary employer. The legislative history of 158(b)(4), frequently referred to as the 'secondary boycott section,' makes it compellingly clear that the evil sought to be eliminated by this legislation was not lawful primary activity, but those union activities which would embroil some neutral employer in a labor dispute not of his making, thus penalizing an unoffending employer to his damage. See National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 672-674, 71 S.Ct. 961, 95 L.Ed. 1284; National Labor Relations Board v. Denver Bldg. Council, 341 U.S. 675, 684-687, 71 S.Ct. 943, 95 L.Ed. 1284; Seafarers International Union, Etc. v. N.L.R.B., 105 U.S. App.D.C. 211, 265 F.2d 585, 590-591; Local 618, Etc. v. National Labor Relations Bd., 8 Cir., 249 F.2d 332.[7]
 
 
 30
 Obviously, the most blatant example of the forbidden secondary activity would be the actual picketing of a neutral employer's premises. That is not the situation here, for the evidence conclusively establishes, indeed plaintiffs concede, that the picketing activities were confined to the primary situs of the dispute, the sole situs available to defendants within the State of Missouri-- this was the place plaintiffs were doing business-- in fact the only place. Furthermore, and perhaps of distinguishing importance is the complete absence of evidence tending to prove that the construction project was a common situs. Apparently the picket line was set up before the employees of any subcontractor, if there were any, had actually begun work on the project. Appellants assert in their brief that 'the record does not show that other employers or employees had their place of work within that situs area at any time here material.' Plaintiffs have not attempted to refute that statement and our examination of the record attests to the accuracy thereof.[8]
 
 
 31
 Plaintiffs rely principally upon National Labor Relations Board v. Denver Bldg. Council, supra, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Bortherhood of Electrical Workers, etc., v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, and Local 74 United Broth. of Carpenters, etc. v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309, in support of their contention that the instant conduct constituted prohibited activities and that this issue was properly submitted to the jury. We refrain from a discussion of the factual situations presented in these cases or the basis for the court's ultimate conclusion that the conduct there complained of was proscribed by 158(b)(4)(A). It is sufficient to observe that in each the presence of a neutral employer at the site of the picketing was a vital, if not the controlling, element which persuaded the Supreme Court to conclude that the activities fell within the proscription of the statute. It is this 'common situs' element which, in our considered opinion, renders those cases inapposite and not controlling here.
 
 
 32
 In our view, National Labor Relations Board v. International Rice Milling Co., supra, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284, is persuasive authority for the conclusion that defendants did not engage in secondary activities. We recognize that in Rice Milling the Supreme Court emphasized that the union did not engage in concerted activities; nevertheless, the situs of the picketing was not ignored. Thus, the Court stated, 341 U.S. at p. 671, 71 S.Ct. at p. 964:
 
 
 33
 'There was no attempt by the union to induce any action by the employees of the neutral customer which would be more widespread than that already described. There were no inducements or encouragements applied elsewhere than on the picket line. The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive. The picketing was directed at the Kaplan employees and at their employer in a mannter traditional in labor disputes.'
 
 
 34
 Moreover, the Supreme Court in National Labor Relations Board v. Denver Bldg. Council, supra, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, recognized that Rice Milling was distinguishable, in part at least, because of the situs of the picketing, stating at pp. 687-688, 71 S.Ct. at pp. 950, 951:
 
 
 35
 'The conduct which the Board here condemned is readily distinguishable from that which it declined to condemn in the Rice Milling case, ante, (341 U.S.) p. 665 (71 S.Ct. 961, 95 L.Ed. 1284). There the accused union sought merely to obtain its own recognition by the operator of a mill, and the union's pickets near the mill sought to influence two employees of a customer of the mill not to cross the picket line. In that case we supported the Board in its conclusion that such conduct was no more than was traditional and permissible in a primary strike. The union did not engage in a strike against the customer. It did not encourage concerted action by the customer's employees to force the customer to boycott the mill. It did not commit any unfair labor practice proscribed by 8(b)(4).'
 
 
 36
 In Local 618, etc. v. National Labor Relations Board, 8 Cir., 249 F.2d 332, this court was concerned with a factual situation bearing resemblance to that presented by this record. The basic question was whether the union's strike and subsequent picketing at the employer's Manchester service station was secondary and proscribed by 158(b)(4)(A) of the Act. This determination turned on the question of whether the Board had properly followed the 'an object' test applied in National Labor Relations Board v. Denver Bldg. Council, supra, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284, and International Brotherhood of Electrical Workers etc., v. National Labor Relations Board, supra, 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299. The Court found that the picketing at the premises of the primary employer constituted lawful primary activity, and thus it was erroneous to apply the 'an object' tests. During the course of the opinion the case of United Electrical, Radio and Machine Workers of America, 85 N.L.R.B. 417 (p. 418) was discussed and a portion of the Board's opinion was quoted at p. 335 of 249 F.2d. Pertinent here is--
 
 
 37
 "* * * Section 8(b)(4)(A) was not intended by Congress, as the legislative history makes abundantly clear, to curb primary picketing. It was intended only to outlaw certain secondary boycotts, whereby unions sought to enlarge the economic battleground beyond the premises of the primary Employer. When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons."
 
 
 38
 The cases which condemned as unlawful secondary activity at 'common situs' projects are in no way applicable here. As we have seen, there was evidence tending to establish that appellants had a legitimate labor dispute with plaintiffs; and in the absence of any evidence whatsoever to support a finding of secondary activity, it was prejudicial error to submit this issue for jury determination.
 
 
 39
 Our ruling that appellants' activities did not fall within the proscriptions of 187(a)(1) does not dispose of the case, for we reach a contrary concclusion with regard to the issue of liability under subsection (4) of 187 (a)-- the so-called 'jurisdictional strike' provisions. From legislative history, it is clear that 187 and 158(b)(4) were designed to make unlawful secondary activities and jurisdictional strikes. In view of the stated purposes of the legislation, and when the object of the strike is found to be to force assignment of particular work to members of a labor organization, the situs of the picketing is not of determinative importance. It is our opinion that the provisions relating to jurisdictional strikes and other activities are designed to protect the primary employer as well as neutral employers from involvement in internal disputes between unions, not of his own making. For this reason, and regardless of the fact that appellants' activities were confined to the 'primary situs,' we find that the issue of unlawful activity on the part of appellants by reason of picketing for the purpose of 'forcing any employer to assign particular work to employees in a particular labor organization,' was properly submitted for jury determination.[9]
 
 
 40
 Without going into detail, clearly there was substantial evidence to support a jury finding that appellants did 'induce' or 'encourage' other employees to refrain from doing business with plaintiffs, and to find that the picket line was established for the purpose of forcing plaintiffs to assign jobs to AFL-CIO members which were already filled by workers affiliated with the United Construction Workers. The record indicates that plaintiffs were willing to hire appellants' members, but that plaintiffs maintained a neutral position as to the affiliation of certain 'key men' required for the project. On the other hand, it is clear that appellants were seeking '100% AFL-CIO' affiliation, and the jury would be entitled to infer that appellants sought to force plaintiffs to replace these 'key men' with members of appellants' organizations. The record would justify a conclusion that the picketing was maintained for no reason other than the dispute over the jobs already filled by members of the United Construction Workers. It was testified that one of appellants' agents, in addressing plaintiffs' employees, stated:
 
 
 41
 'We understand you come from another part of the country where you have been working for the United Construction Workers. We are familiar with the United Construction Workers and they have tried to come into this part of the country at another time, and the fact is we don't intend to let them light. We are, in the A.F. of L., have been, in this country for a long time and we intend for this job to be A.F. of L.'
 
 
 42
 The record also establishes that plaintiffs took a 'neutral position' in respect to the union affiliation of their employees. Thus, we find this testimony of Mr. Hartz concerning a meeting held August 23 at the construction site where representatives of the AFL-CIO unions were given an opportunity to address plaintiffs' employees and invite them to join with the A.F. of L.
 
 
 43
 '* * * I addressed the people there, our men at that point, and I said, in effect, that they understood now what the A.F. of L. had to offer them; that if they wished to join the A.F. of L. we were behind them one hundred percent; if they wanted to join the U.C.W., or stay with the U.C.W. (United Construction Workers), we were still behind them one hundred percent. As far as Mr. Pauly's threat (agent of the Carpenters) was concerned, there might be a possibility he would be able to cut us off and shut us down, but if they wanted to work with the U.C.W. we would certainly be willing to try it.
 
 
 44
 'The men then asked Mr. Pauly * * * several questions * * * and Mr. Pauly then asked the men if they were interested, and the men said they liked it the way they were.'
 
 
 45
 Appellants also contend that the facts here do not establish a true 'jurisdictional dispute.' While 158(b)(4)(D) and its counterpart 187(a)(4) are of particular aid in disputes involving two rival unions within an employer organization, it is clear that these sections are also applicable when the dispute might be said to be solely between an employer and a union. See International Longshoremen etc., v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275; Vincent v. Steamfitters Local Union 395, etc., 2 Cir., 288 F.2d 276; and Note, 64 Harv.L.R. 781, 806, and cases cited, f.n. 192 at p. 806.
 
 
 46
 Appellants also assert that the evidence relating to damages sustained by plaintiffs was insufficient to present a jury issue; that the evidence was too remote, speculative and uncertain to form the basis of a lawful judgment. This contention is without substance. We have examined the record and are satisfied that there was probative evidence from which the jury could legitimately find that as the direct and proximate result of the proscribed conduct of appellants, plaintiffs sustained actual damages, and appellants would not be entitled to a directed verdict solely upon the issue of damages.
 
 
 47
 We have ruled that while the issue of unlawful jurisdictional picketing was properly submitted to the jury, the issue of unlawful secondary activity was erroneously submitted. In looking to the trial court's instructions, we find that the two issues were submitted alternatively and in such a manner that we are compelled to hold that prejudicial error inhered in the verdict. After hypothesizing certain of the facts, the court instructed the jury as follows:
 
 
 48
 '* * * but, even though one purpose of the picketing may be perfectly legal under primary picketing definition, if one of the purposes is one of the three things I previously outlined (the 'three objects' being violations of 187(a) (1), (2), and (4)) * * * that amounts to a secondary boycott within the definition of the law, or a jurisdictional dispute within that definition, it is illegal, and if you find that that sort of thing existed and that one or more of the defendants violated that statute in any of the objects set forth, as I have defined it here, then you will find for the plaintiff and against the defendants * * *.'
 
 
 49
 The principle is firmly established that where a case is submitted to the jury upon more than one theory, and the submission on one theory is erroneous and a general verdict is returned, the verdict cannot be upheld because it is impossible to determine with certainty the theory upon which the jury based its verdict. Under such circumstances a new trial should be granted. Superior Combustion Industries v. Schollman Bros. Co., 8 Cir., 271 F.2d 357, 364, and cases there cited.
 
 
 50
 The verdict here is a general one. It is impossible for us to determine with certainty upon what theory the jury based its verdict. In this situation the cause must be remanded for a new trial.
 
 
 51
 By way of addendum,-- the failure of appellants to file an after-trial motion for judgment notwithstanding the verdict, as authorized by Rule 50(b) of the Federal Rules of Civil Procedure, limits the scope of relief we could grant. Even if the evidence were insufficient to present a question of fact for the jury on any issue, as appellants have contended, the maximum relief to which they would be entitled, in the absence of a motion n.o.v., is a new trial. Cone v. West Virginia Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849; Globe Liquor Co. v. San Roman, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Johnson v. New York, N.H. & H.R. Co., 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77; Johnson Machine Works, Inc. v. Chicago, B. & Q.R. Co., 8 Cir.,297 F.2d 793, 799; Dunlop Tire and Rubber Corporation v. Thompson, 8 Cir.,273 F.2d 396, 401.
 
 
 52
 The judgment is reversed and the cause remanded for a new trial.
 
 
 
 [1]
 Section 303 of the Act, 29 U.S.C.A. 187, providing a civil remedy by suit for damages is a counterpart to 8(b)(4) of the Act, 29 U.S.C.A. 158(b)(4), which provides that certain conduct constitutes an unfair labor practice for which an administrative remedy is afforded. Since both sections are couched in similar language, it is our opinion that decisional law on 158(b)(4) is controlling as to interpretation of 187
 
 
 [2]
 Docket entries reveal that on December 21, 1961, plaintiffs filed a partial satisfaction of judgment, acknowledging payment of $15,000 by the defendant Laborers
 Hereinafter we shall refer to the appealing defendants as appellants-- and to parties originally sued as defendants.
 
 
 [3]
 It appears that the 'Building Trades Council' was an affiliation of various AFL-CIO unions representing the separate trades or crafts in the Springfield area
 
 
 [4]
 The trial court submitted this specific issue to the jury
 
 
 [5]
 The record reflects that employees of plaintiffs, in working in other sections of the United States, had been affiliated with the United Construction Workers on previous occasions
 
 
 [6]
 At this point it should be observed that there was a proceeding before the National Labor Relations Board under 10(k) of the Act, 29 U.S.C.A. 160(k), initiated by the filing of a complaint on October 4, 1957, by plaintiffs herein, which alleged that all of the defendants were engaging in unfair labor practices within the meaning of 8(b)(4)(D) of the Act (jurisdictional dispute). The plaintiffs had previously filed a charge alleging violations of 8(b)(4)(A) abd (B) but the regional director ruled that investigation on these charges would cease due to pendency of the 10(k) proceeding. The Board found that all the unions involved, except the Operating Engineers, 'are not, and have not been lawfully entitled to force or require Markwell & Hartz Contractors to assign the disputed work to their members rather than to the employees assigned to that work by Markwell & Hartz Contractors, who are not members of (the AFL-CIO organizations).' See 120 N.L.R.B. No. 77
 
 
 [7]
 Portions of the Congressional Debates are quoted in Rich Milling at pp. 673, 674, 71 S.Ct. 965, 966, and in Denver Bldg. Council, at pp. 686-687, of 341 U.S. at p. 950 of 71 S.Ct. Pertinent are the remarks of Senator Taft in connection with 8(b)(4):
 '* * * under the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. It had been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice.'
 By 1959 amendments (now 158(b)(4)(B)) Congress has specifically provided that the prohibitions found in subsections (A) and (B) of 158(b)(4) of the 1947 Act shall not be applicable to primary strikes or primary picketing. See also Koretz, 'Federal Regulation of Secondary Strikes and Boycotts-- a Third Chapter,' 13 Syracuse L.R. No. 1, p. 1; Johns, 'Secondary Boycotts,' 13th Annual Conference on Labor, N.Y.U., p. 123; Note, 64 Harv.L.R. 781.
 
 
 [8]
 Union activities at a 'common situs,' where neutral employees are working side-by-side with a primary employer with whom the union has a controversy, present special problems in determining whether activities are primary or secondary, and special tests or standards have been set up for resolving the issue. See Sailors' Union of the Pacific (Moore Drydock), 92 N.L.R.B. 547; Local 618, Etc. v. National Labor Relations Bd., 8 Cir., 249 F.2d 332, 335
 
 
 [9]
 Without meaning to imply that by offering an instruction on the issue, appellants waived their right to contend there was no submissible case made under the jurisdictional dispute section, we note with some significance that appellants did offer their instruction No. 3 which would have submitted this issue to the jury